**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 8, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LAWRENCE RUDOLPH,

    Defendant - Appellant.

------------------------------

NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS,

    Amicus Curiae.

No. 23-1278

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:22-CR-00012-WJM-1)**
_____

David Oscar Markus (Lauren Doyle Perez, with him on the briefs), Markus/Moss
PLLC, Miami, Florida, for Defendant-Appellant.

J. Bishop Grewell, Assistant U.S. Attorney (Matthew T. Kirtch, Acting United States
Attorney, with him on the brief), Office of the United States Attorney, Denver,
Colorado, for Plaintiff-Appellee.

Norman R. Mueller, Haddon, Morgan and Foreman, P.C., Denver, Colorado, and
Neil S. Sandhu, Brownstein Hyatt Farber Schreck, LLP, Denver, Colorado, filed an
Amicus Curiae Brief for National Association of Criminal Defense Lawyers.

_____

Before **HOLMES**, Chief Judge, **MORITZ**, and **ROSSMAN**, Circuit Judges.

_____

**HOLMES**, Chief Judge.

_____

Defendant-Appellant Lawrence "Larry" Rudolph was tried and convicted for the fatal shooting of his wife, Bianca Rudolph, during a hunting trip to Zambia. The district court subsequently sentenced him to life imprisonment and ordered him to forfeit certain assets he purchased after procuring his wife's life insurance proceeds. Mr. Rudolph now appeals from his conviction and the forfeiture order, arguing that the district court erred by (1) denying his motion for severance; (2) denying his motion for improper venue; (3) admitting at trial certain statements that Bianca made to a friend shortly before her death; and (4) ordering the forfeiture of certain assets. For the reasons discussed herein, we **affirm**.

## I.  BACKGROUND[1]

### A.  Factual Background

### 1.  Larry and Bianca Rudolph's Marriage

In 2016, Larry and Bianca Rudolph had been married for nearly thirty-five years, had two children, and lived together near Pittsburgh, Pennsylvania. Mr. Rudolph, a renowned dentist, owned Three Rivers Dental Group ("Three Rivers Dental"), a dental company operating multiple dental offices in Western

---

[1]     "On appeal, we review the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government." *United States v. McVeigh*, 153 F.3d 1166, 1177 n.1 (10th Cir. 1998).

2

Pennsylvania.  Three Rivers Dental prospered, and the Rudolphs soon amassed a net worth in the several millions of dollars.  In 2000, the Rudolphs had $9.5 million in marital assets, and they eventually purchased homes in Pennsylvania, Wyoming, and Arizona.  The Rudolphs also maintained life insurance policies in each of their names—Mr. Rudolph for at least $3.3 million, and Bianca for about $4.8 million.

The Rudolphs shared a passion for hunting.  A room in their home was dedicated to showcasing the hunting trophies they had collected.  Mr. Rudolph was an avid big-game hunter and prominent member of Safari Club International ("Safari Club"), a hunter advocacy organization.  Bianca, also a Safari Club member, was an experienced big-game hunter in her own right, having successfully hunted lions and rhinoceroses.  The couple frequently traveled to Africa for hunting safaris, making multiple such trips to Zambia.

But the Rudolphs did not have a perfect marital relationship.  Each cheated on the other.  Bianca confided in others regarding her marital issues, including her brother, Ralph Finizio, and her friend, Cassandra Olmstead, who worked as Mr. Rudolph's assistant.  Mr. Rudolph maintains that in 2000, he and Bianca signed a postnuptial agreement whereby he agreed to pay her a flat fee of $2 million in the event of their divorce.[2]

---

[2]    Mr. Rudolph introduced this purported postnuptial agreement into evidence at trial, and both he and Bianca appear to have signed it.  However, Mr. Rudolph and the government have disputed the authenticity and enforceability of this agreement—both at trial and on appeal.

The Rudolphs' marital troubles compounded in the spring of 2016, when Bianca learned from Ms. Olmstead that Mr. Rudolph was having a romantic affair with Lori Milliron. Ms. Milliron—an operations manager at Three Rivers Dental who had risen to become a partner in the practice—was Mr. Rudolph's longtime paramour; the two had been romantically involved for over a decade. Ms. Olmstead revealed to Bianca that she had discovered email exchanges between Mr. Rudolph and Ms. Milliron exposing the affair. Those emails, some more than five years old, included numerous salacious messages in which Mr. Rudolph and Ms. Milliron professed their love for one another and discussed their sexual relationship.[3] With Ms. Olmstead's help, Bianca later accessed and read the emails herself.

Bianca was distraught upon learning of this affair. Bianca told Ms. Olmstead that she was generally opposed to divorce and would do anything to save her marriage. She also feared the financial consequences of divorce, recalling to Ms. Olmstead that Mr. Rudolph had previously forged her signature on a document stipulating that Bianca would not receive any money in a divorce. Bianca said Mr. Rudolph would frequently forge her signature and was adept at doing it. She had searched for this document to destroy it but never located it. Despite her trepidation,

---

[3]    *See, e.g.*, Aplee.'s Suppl. App., Vol. III, at 456 (Email from Ms. Milliron to Mr. Rudolph, sent Aug. 1, 2010) ("I miss you more than you can imagine . . . . I love you baby. Always will. Can't resist you . . . . Maybe we can spend the night together when we get back?[]  I am crazed for you."); *id.* at 460 (Email from Mr. Rudolph to Ms. Milliron, sent Aug. 2, 2010) ("I might be home tonight . . . . Will [you] be too tired for crazy sex?"); *id.* at 542 (Email from Mr. Rudolph to Ms. Milliron, dated Apr. 9, 2011) ("I love [you.]").

Bianca told Ms. Olmstead that she would confront her husband about the affair and give him an ultimatum: if Mr. Rudolph did not end the affair with Ms. Milliron, Bianca would divorce him.

A few weeks later, Bianca told Ms. Olmstead that she had successfully confronted Mr. Rudolph about the affair and delivered the ultimatum. After initially denying the affair, Mr. Rudolph came clean once Bianca told him she had seen his email exchanges with Ms. Milliron. He agreed with Bianca to terminate the affair and committed to firing Ms. Milliron from Three Rivers Dental. He later told Bianca, however, that firing Ms. Milliron would take time because she was a partner in the practice. Despite his commitments to end the affair, Mr. Rudolph traveled to Cabo San Lucas ("Cabo"), Mexico with Ms. Milliron in July 2016.

### 2. Mr. Rudolph's Safari Club Defamation Lawsuit

Back in 2012, while his affair with Ms. Milliron was ongoing, Mr. Rudolph sued Safari Club and its board of directors for defamation (the "Safari Club litigation"). Mr. Rudolph had served as president of Safari Club from 2009 to 2011. But the Safari Club board expelled him in August 2012 for, among other things, allegedly using his position to engage in adultery. In his complaint, Mr. Rudolph accused Safari Club and its board of falsely stating that he was having an affair with a woman in Atlanta under the pretext of Safari Club business and that he had

previously engaged in adulterous conduct. Mr. Rudolph specifically alleged that the adultery accusations were damaging to his marriage.[4]

### 3. The Fatal Shooting of Bianca Rudolph

In late September 2016, months after their confrontation about Mr. Rudolph's affair, Bianca and Mr. Rudolph traveled for a safari to Chinyembe, Zambia, where Bianca had hoped to hunt leopards. Chinyembe is located in a remote area of Zambia, about 150 kilometers from the nearest town. The couple was joined by Mark Swanepoel, a professional hunting guide who had previously accompanied the Rudolphs on their Zambian safaris, and Spencer Kakoma, Mr. Swanepoel's game scout. During the safari, the Rudolphs resided in a cabin within a guest camp. Mr. Rudolph brought a 12-gauge semi-automatic Browning shotgun for the safari, explaining to Mr. Swanepoel that the shotgun could account for the speed of the leopards. Mr. Swanepoel tested the shotgun in preparation for the hunt and determined that it functioned properly. Both Mr. Rudolph and Bianca were

---

[4]    During his criminal trial, Mr. Rudolph admitted that he knowingly made false statements by claiming that he was not an adulterer and that the adultery claims harmed his marriage. He also admitted to falsifying interrogatory responses in the Safari Club litigation by failing to list Ms. Milliron as someone he was engaged in adultery with and stating that he had not communicated with her via email between 2006 and 2013. Then, in a May 2016 deposition, Mr. Rudolph again lied about his relationship with Ms. Milliron to hide their relationship. Bianca was deposed for the same litigation, and she too falsely denied that Mr. Rudolph was having an affair with Ms. Milliron even though she had already discovered the affair.

unfamiliar with the Browning shotgun—they had greater experience with rifles—but Mr. Rudolph ably handled the shotgun on the safari.

The leopard hunt lasted twelve days, but much to the group's dismay, no leopards were seen or shot. After another unsuccessful final day, the Rudolphs returned to their cabin, anticipating an early departure the following morning.[5] As the group retired, Mr. Swanepoel unloaded his and Bianca's rifles and witnessed Mr. Rudolph unload his shotgun and return it to its case. The firearms, including the shotgun, were each individually stored in soft cases. When the group returned to the guest camp, a room attendant brought the firearms into the Rudolphs' cabin.

The following morning, on October 11, 2016, at around 5:00 a.m., Mr. Swanepoel heard a gunshot followed by a "winded" scream from the Rudolphs' cabin. J.A., Vol. VIII, at 1966 (Trial Tr., dated July 13, 2022) ("[I]t sounded almost like a bit of a scream but like a winding sound, you know. Not so much a scream that you would typically hear, but more like a -- you know, an expulsion of air, but, yeah, sounded like a shout."). He and Mr. Kakoma quickly ran to the cabin. Inside, they discovered Bianca's lifeless body on the floor in a pool of blood and Mr. Rudolph positioned in the bathroom doorway. Bianca had been fatally shot directly through her heart. She was shot by the shotgun Mr. Rudolph had brought for the safari; the lethal projectile had penetrated the shotgun's unzipped soft case, which now rested

---

[5]    The safari was initially scheduled for fourteen days; although Mr. Rudolph preferred to stay for the entirety of the two weeks, Bianca opted to shorten the trip in order to return home for a nephew's wedding.

on the floor with the shotgun still inside.  She and Mr. Rudolph were alone in the cabin at the time she was shot.

Upon arriving, Mr. Swanepoel ran straight to Bianca's body, put his hands on her chest to stop the bleeding, and began performing CPR.  He noticed Mr. Rudolph was visibly upset, shouting for help, and frantically attempting to aid Mr. Swanepoel.  But given her condition, Bianca could not be saved.  A forensic examiner later opined that the wound to her chest would have killed Bianca in less than a minute.

Mr. Rudolph claimed that he was in the bathroom when the shooting occurred and did not see it happen.  After hearing the shot, he purportedly stepped out of the bathroom and observed Bianca on the floor surrounded by blood.  He stood in shock for a few seconds before Mr. Swanepoel arrived and attempted to revive her.  After realizing that his wife was dead, he became hysterical.  Mr. Rudolph testified at trial that Bianca must have accidentally shot herself.

The day after Bianca's death, her body was transported to a hospital in Lusaka, Zambia for an autopsy.  The autopsy determined that she died from a gunshot wound causing hemorrhagic shock, maceration of the left side of her heart, and perforation of her lung.  In other words, Bianca had died from excessive bleeding and a direct injury to her heart.

### 4.  Aftermath of Bianca's Death

Zambian authorities immediately opened an investigation into Bianca's death; they reviewed the scene of the shooting, analyzed evidence, and interviewed relevant witnesses, including Mr. Rudolph.  Early in the investigation, conflicting reports

8

emerged as to whether Bianca's death was an accident or a suicide. Ultimately, however, Zambian authorities concluded that Bianca died by accident and found no evidence of foul play. Bianca's final notice of death—issued by the Zambian government and signed by the United States Embassy in Zambia (the "Embassy")— identified her cause of death as the accidental discharge of a firearm.

On the same day as Bianca's death, Mr. Rudolph called a consular official at the Embassy, Otto Westhassel, and asked how quickly his wife's remains could be cremated so that he could leave the country.[6] Mr. Rudolph's urgency surprised Mr. Westhassel. In a subsequent call, Mr. Rudolph reiterated his request for a speedy cremation.

On October 13, Mr. Westhassel contacted a local crematorium to arrange for Bianca's cremation. Later that day, Mr. Westhassel received word that Bianca would be cremated the next morning. Concerned because the Embassy had yet to identify Bianca's remains, Mr. Westhassel and two diplomatic security agents hurried to the funeral home. There, they identified Bianca's remains with her passport, recorded measurements of the chest cavity, and took photos.

Bianca was cremated on October 14. At the time of her cremation, her children had not yet learned of her death; Mr. Rudolph intended to notify them in person. Shortly after the cremation, Mr. Rudolph returned to the United States: he

---

[6]    Bianca's will, entered into evidence at trial, specified that she wished for her remains to be cremated.

first flew from Lusaka, Zambia, to Johannesburg, South Africa, then to Atlanta, Georgia, and finally to Phoenix, Arizona. After a news article reported on Bianca's death, Mr. Rudolph, still en route to the United States, called his son and delivered the news. A few days after his arrival in Arizona, Mr. Rudolph held a small memorial service for Bianca.

### 5. Mr. Rudolph Collects Bianca's Life Insurance Proceeds, and Ms. Milliron Joins Him in Arizona

Two days after returning from Africa, Mr. Rudolph emailed a lawyer, asking for "the very best counsel to manage life insurance claims." Aplee.'s Suppl. App., Vol. II, at 340 (Trial Ex. 55, filed Aug. 16, 2024). He eventually submitted about $4.8 million in claims to seven insurance companies that held life insurance policies under Bianca's name.[7] One of those insurance companies had offices in Englewood, Colorado. For each claim, Mr. Rudolph identified Bianca's death as "accidental." If the insurance companies had concluded that Mr. Rudolph had in fact shot Bianca, they would not have paid out the life insurance claims.[8] But they seemingly did not reach this conclusion.

The insurers paid the totality of Bianca's life insurance policies to Mr. Rudolph, disbursing a total of $4,877,744.93. Mr. Rudolph subsequently executed a

---

[7]　　Either Mr. Rudolph or the Rudolph Trust—for which Mr. Rudolph was sole trustee and beneficiary after Bianca's death—was the beneficiary of every policy covering Bianca's life.

[8]　　As one insurance representative explained at trial, "[t]he majority of states have slayer statutes. So if the beneficiary is the person that caused the insured to pass away, [the insurance] benefits would not be payable." J.A., Vol. XI, at 2760

series of transactions between bank accounts and purchased multiple assets.

Particularly relevant to this appeal, Mr. Rudolph paid $1.15 million as down payment

on a $3.8 million home in Paradise Valley, Arizona; $3 million as collateral for a

$2.5 million construction loan for the same property; $400,000 as down payment and

closing costs for a property in Cranberry Township, Pennsylvania; $100,000 for a

condo in Cabo, Mexico; $239,000 for a 2018 Aston Martin DB-11 automobile; and

$162,000 for a 2017 Bentley Bentayga automobile.

Less than two weeks after he returned from Zambia, Mr. Rudolph bought Ms.

Milliron a one-way flight to join him in Phoenix. Over the course of the next year,

the two began living and traveling together—to Jackson Hole, Wyoming; Pittsburgh,

Pennsylvania; and frequently to Cabo, Mexico. Their relationship endured through

Mr. Rudolph's eventual trial.

During their stays in Arizona, Mr. Rudolph and Ms. Milliron frequented Steak

44, an upscale steakhouse in Arcadia, Arizona. Brian Lovelace, a bartender at Steak

44, knew the couple as regular patrons. On one occasion, in early 2020, Mr.

Lovelace observed an uncomfortable conversation between the couple. When the

background music at the steakhouse paused to shift songs, Mr. Lovelace overheard

---

(Trial Tr., dated July 18, 2022). To that end, the insurers hired an investigator—a company called Diligence—to review the Zambian investigation and confirm that Bianca had died by accident; at the close of its investigation, Diligence reported no evidence casting doubt on the idea that Bianca had died by accident. Diligence did, however, note in its report that Zambian police had certain unresolved questions at the conclusion of their investigation into Bianca's death.

11

Mr. Rudolph say harshly to Ms. Milliron: "I killed my [fuck]ing wife for you." J.A., Vol. XVI, at 4116 (Trial Tr., dated July 26, 2022).[9] Ms. Milliron subsequently put her head down, grabbed her purse, and exited the steakhouse. Mr. Lovelace observed that Ms. Milliron looked embarrassed, but not surprised, by Mr. Rudolph's outburst.

## B. Procedural History

### 1. Investigation, Arrest, and Indictment

Beginning in July 2019, the Federal Bureau of Investigation ("FBI") in Denver, Colorado opened an investigation into Bianca's death after conducting a review of suspicious death cases. Both the FBI and the Embassy had received concerned calls from Bianca's friends and family regarding her death. In the course of its investigation, the FBI reviewed the Zambian investigation, test-replicated the fatal shooting using a duplicate shotgun and soft case, consulted with firearms experts, and interviewed witnesses to determine Bianca's state of mind prior to her

---

[9]    In contrast, Mr. Rudolph stated at trial that he in fact said, "*Now they're saying* I killed my [fuck]ing wife for you," J.A., Vol. XVIII, at 4581 (Trial Tr., dated July 27, 2022) (emphasis added), and Mr. Lovelace acknowledged that it was possible that he missed the first few words of Mr. Rudolph's statement. Mr. Rudolph said that he first learned of the FBI investigation into Bianca's murder from Mr. Swanepoel in January 2020, although Mr. Swanepoel testified that he first spoke to Mr. Rudolph about being approached by the FBI in the summer of 2020—months *after* Mr. Rudolph's outburst in Steak 44.

death. Based on its findings, the FBI determined that it had enough evidence to charge Mr. Rudolph with Bianca's murder.

In December 2021, Mr. Rudolph and Ms. Milliron traveled to Cabo. At the time, they resided together in Phoenix. Before the couple left for Cabo, the FBI had already drafted—and successfully presented to a federal magistrate judge for approval—an initial criminal complaint charging Mr. Rudolph with Mail Fraud (18 U.S.C. § 1341) for defrauding the insurance companies of Bianca's life insurance proceeds by falsely representing that Bianca's death was an accident. Once Mr. Rudolph landed in Cabo, the FBI, in coordination with Mexican immigration officials, had Mr. Rudolph detained and deported to Denver, Colorado.

While Mr. Rudolph was on the deportation flight to Denver, the FBI secured a superseding criminal complaint, charging Mr. Rudolph with both Mail Fraud (18 U.S.C. § 1341) and Foreign Murder (18 U.S.C. §§ 1119 and 1111)—the latter charge being for the fatal shooting of Bianca in Zambia. On December 22, 2021, Mr. Rudolph's deportation flight landed at Denver International Airport, where he was arrested on both charges.

After Mr. Rudolph's arrest, Ms. Milliron was subpoenaed to appear before a grand jury investigating the charges against Mr. Rudolph. In her testimony, Ms. Milliron made statements downplaying the extent of her relationship with Mr.

Rudolph and expressing that Mr. Rudolph had proclaimed his innocence to her regarding Bianca's death.[10]

On January 5, 2022, the same District of Colorado grand jury returned an indictment charging Mr. Rudolph with two counts: Count 1, Foreign Murder, in violation of 18 U.S.C. §§ 1119 and 1111; and Count 2, Mail Fraud and Aiding and Abetting, in violation of 18 U.S.C. §§ 1341 and 1342. A month later, a District of Colorado grand jury returned a superseding indictment (the "Indictment") charging Mr. Rudolph with the same two counts and adding seven counts against Ms. Milliron: Count 3, Accessory After the Fact to Foreign Murder, in violation of 18 U.S.C. § 3; Count 4, Obstruction of a Grand Jury Proceeding, in violation of 18 U.S.C. § 1503(a); and Counts 5–9, Perjury Before a Grand Jury Proceeding, each count alleging a violation of 18 U.S.C. § 1623(a). Ms. Milliron's prior statements to the grand jury gave rise to the Obstruction and Perjury counts.

## 2. Pretrial Motion to Dismiss Count One for Improper Venue

Mr. Rudolph moved to dismiss Count One of the Indictment (Foreign Murder) for improper venue. He alleged that the government, hoping to establish venue in Colorado instead of Arizona, engaged in forum shopping by arresting him in Mexico and deporting him to Colorado.[11] Invoking the venue statute for extraterritorial

---

[10]    Ms. Milliron's grand jury testimony was not admitted for the government's case against Mr. Rudolph at trial, so we do not reproduce her statements in detail here.

[11]    Both before and during trial, the FBI admitted that it waited for Mr. Rudolph to travel to Mexico in order to create a basis for venue in Colorado. The

offenses, which stipulates that a defendant must be tried for those offenses in the district where the defendant is "arrested" or "first brought," Mr. Rudolph argued that venue was only proper in the Northern District of Georgia, where he was "first brought" by his layover flight upon his return from Zambia following Bianca's death.

The district court denied Mr. Rudolph's motion to dismiss, concluding that venue was proper in the District of Colorado under § 3238. The court explained that, under § 3238, venue is proper for a foreign-murder charge both in the district where the defendant was "arrested" *and* in the district where the defendant was "first brought." Under either provision, the district court held, the District of Colorado was the only conceivable venue for Mr. Rudolph's trial: Mr. Rudolph was first "arrested" in Denver, Colorado, and was "first brought" to Denver by authorities after he was deported from Mexico.

### 3. Pretrial Motion for Severance

Before trial, Mr. Rudolph filed a motion for severance, seeking to remove Ms. Milliron as a co-defendant from his forthcoming trial. He raised two grounds for his motion. First, he argued that his counts in the Indictment arose from distinct and separate acts from Ms. Milliron's counts, such that the initial joinder of their Indictment was improper under Federal Rule of Criminal Procedure 8(b). Second, he contended that severance was appropriate under Federal Rule of Criminal Procedure

---

FBI explained that Colorado was a more convenient forum for the investigative team and prosecutors.

14(a) because a joint trial would violate his constitutional right to present defense testimony—specifically, testimony from Ms. Milliron—and result in unfair prejudice. He explained that Ms. Milliron was willing to provide testimony in a severed trial of Mr. Rudolph—but not in a joint trial—that would refute the government's contentions regarding Mr. Rudolph's motive to kill Bianca. According to Mr. Rudolph:

> Ms. Milliron has invoked her right to a speedy trial to put these trumped-up charges behind her and restore the *status quo ante*. Once that happens, she will again have nothing to fear from testifying truthfully and refuting the testimony of the disgruntled former employee and the eavesdropping bartender on which the government plans to hinge its case. Her testimony will corroborate every other statement made by [Mr.] Rudolph (to police, to the insurance company, and to friends and family) that his wife died from an accident. There was no confession. As she explains in the attached affidavit, Ms. Milliron would not testify in a joint trial but would *be available* in [Mr.] Rudolph's severed trial if it proceeds after her trial.

J.A., Vol. I, at 166–67 (Mot. for Severance, filed Mar. 22, 2022) (emphasis added). Attached to Mr. Rudolph's motion was an affidavit from Ms. Milliron, in which she stated she had "first-hand knowledge" of the conversations between (1) herself and Mr. Rudolph at Steak 44, where Mr. Lovelace allegedly overheard Mr. Rudolph effectively confess to murdering Bianca; and (2) herself and Anna Grimley, an employee at Three Rivers Dental, with whom Ms. Milliron had spoken about her affair with Mr. Rudolph. J.A., Vol. I, at 173 (Aff. of Lori Milliron, dated Mar. 17, 2022). Ms. Milliron declared that her recollections "flatly contradict[ed]" those witnesses' accounts. *Id.* (emphasis omitted).

16

The district court denied Mr. Rudolph's motion for severance in full.[12]  The court first concluded that Mr. Rudolph's and Ms. Milliron's counts were properly joined in the Indictment under Rule 8(b) because their counts were part of the same series of acts or transactions.  Next, the district court held that severance was not warranted because (1) Ms. Milliron only made *conditional* assurances to testify, (2) her affidavit was vague and conclusory, and (3) judicial economy favored a joint trial.[13]

### 4.  Relevant Trial Proceedings

In July 2022, Mr. Rudolph and Ms. Milliron were jointly tried before a District of Colorado jury.[14]  As to Mr. Rudolph, the government theorized that he intentionally shot Bianca—choosing a remote area in Zambia to perpetrate the shooting—to collect Bianca's life insurance proceeds and live happily thereafter with Ms. Milliron.  To that end, the government presented witness testimony regarding the Rudolphs' troubled marital relationship and Mr. Rudolph's actions before and after

---

[12]    Mr. Rudolph twice moved for the court to reconsider severance—once before and once after trial—but the district court denied each of his successive motions.  Mr. Rudolph also made multiple requests for severance at trial, but the district court summarily denied each request.

[13]    In a footnote, the district court further stated that "Defendant Rudolph can also waive his Fifth Amendment privilege against self-incrimination to testify regarding his recollections of certain conversations."  J.A., Vol. I, at 212 n.3 (Order Den. Mot. to Dismiss, dated Apr. 12, 2022) (emphasis omitted).

[14]    Mr. Rudolph and Ms. Milliron were represented by separate counsel at trial.

Bianca's death, including testimony from Mr. Finizio, Mr. Swanepoel, Mr. Kakoma, Mr. Westhassel, Mr. Lovelace, and Ms. Olmstead.  Multiple representatives from the insurance companies who paid out Bianca's life insurance proceeds also testified.

Separately, the government claimed that Bianca could not have accidentally shot herself based on her arm length, the length of the shotgun, the size of the entry wound, the wound angle, the blood stain patterns on her clothing, and the lack of blood on the shotgun's soft case.  In support, the government adduced evidence from, among others, firearms and ballistics experts, forensic analysts, FBI crime scene experts, and an anthropometrist.[15]  In addition, the government sought to dispute the authenticity and enforceability of the Rudolphs' alleged 2000 postnuptial agreement. Notably, to accomplish this, the government offered evidence from James Padish, a former Arizona state court judge and family law expert, who claimed the agreement was inauthentic and unenforceable, and Joseph Smith, Mr. Rudolph's friend, who discussed with Mr. Rudolph the possibility of signing a postnuptial agreement with Bianca approximately ten years *after* the 2000 postnuptial agreement was allegedly signed—casting doubt on the existence of an enforceable and valid 2000 postnuptial agreement.

Relevant to this appeal, Ms. Olmstead testified about her 2016 conversations with Bianca—months before Bianca's death—regarding the Rudolphs' marital troubles.  Before trial, Mr. Rudolph had objected to the admission of Ms. Olmstead's

---

[15]    Anthropometry is the study of measuring people.

18

testimony, claiming it amounted to inadmissible hearsay. In opposition, the government sought to admit six specific statements Bianca made to Ms. Olmstead under the forfeiture-by-wrongdoing exception to the hearsay rule, Federal Rule of Evidence 804(b)(6), which allows hearsay statements in instances where the defendant wrongfully caused the declarant's unavailability as a witness. The government insisted that the Rule 804(b)(6) exception applied because Mr. Rudolph killed Bianca in part to prevent her from testifying as a witness in a future divorce proceeding and in the Safari Club litigation.

The district court ultimately admitted the six Olmstead statements under Rule 804(b)(6). The admitted statements comprised Bianca's purported assertions to Ms. Olmstead that: (1) Mr. Rudolph often signed Bianca's name on documents; (2) he was good at forging her signature; (3) he had written up an agreement specifying that she would get nothing in a divorce and signed her name on it; (4) she tried to find that agreement for years and was worried about it; (5) she later confronted Mr. Rudolph about the Milliron affair, which he initially denied before admitting to it when confronted with the emails; and (6) Mr. Rudolph ultimately agreed to break off the affair with Ms. Milliron and fire her from Three Rivers Dental. To admit the statements under Rule 804(b)(6), the district court first found by a preponderance of the evidence that Mr. Rudolph caused Bianca's unavailability by killing her. Second, the court found by a preponderance of the evidence that, as to the first four statements, Mr. Rudolph killed Bianca with the intent to prevent her from testifying

19

in a divorce proceeding, and, as to the final two statements, Mr. Rudolph killed Bianca with the intent to prevent her from testifying in the Safari Club litigation.

Finally, in its case against Ms. Milliron, the government presented testimony from Rachel Anders and Anna Grimley, each of whom had spoken to Ms. Milliron about her affair with Mr. Rudolph. Ms. Anders testified about the lavish lifestyle Ms. Milliron adopted after her affair with Mr. Rudolph commenced and recounted that Ms. Milliron said Mr. Rudolph could not get divorced because Bianca would take all his wealth and dental practices in a divorce. Ms. Grimley testified that Ms. Milliron had issued an "ultimatum" to Mr. Rudolph: if he did not "get rid of" Bianca, Ms. Milliron would break off the affair. J.A., Vol. XIV, at 3467 (Trial Tr., dated July 21, 2022). Significantly, Ms. Anders's and Ms. Grimley's testimony concerning these conversations was only admissible against Ms. Milliron—*not* against Mr. Rudolph. For that reason, before those witnesses testified about their conversations with Ms. Milliron, the district court read a limiting instruction prohibiting jurors from considering their testimony in the government's case against Mr. Rudolph.

After ten days of evidence, the government rested. The defense's case emphasized the lack of evidence tying Mr. Rudolph to Bianca's fatal shooting, asserting instead that Bianca accidentally shot herself by dropping the shotgun while packing for the couple's morning flight. The defense offered testimony from five witnesses, including a firearms expert, a pathologist, and a forensic analyst. Further, the defense claimed that Mr. Rudolph had no motive to kill Bianca because the couple maintained a happy, open marriage in which extramarital sex was accepted.

20

Along those lines, the defense admitted into evidence the alleged 2000 postnuptial agreement, arguing it was authentic and enforceable, and positing that it reinforced Mr. Rudolph's lack of motive to kill Bianca, as a divorce would not have been financially burdensome to Mr. Rudolph in light of that agreement.

Last to testify was Mr. Rudolph himself.  Mr. Rudolph unequivocally denied murdering Bianca, claimed her death was an accident, and explained that he was in the bathroom when the shotgun went off.  He denied admitting to the murder at Steak 44 and clarified that he spent time with Ms. Milliron after Bianca's death as part of his grieving process.  At the conclusion of Mr. Rudolph's testimony, the parties gave closing arguments, and the case was submitted to the jury.

### 5.  Jury Verdict

The jury convicted Mr. Rudolph on both counts—Foreign Murder and Mail Fraud.  As to Ms. Milliron, the jury convicted her on four of her seven counts—Accessory After the Fact to Foreign Murder, Obstruction of a Grand Jury Proceeding, and two counts of Perjury—and acquitted her on the remaining three counts.

### 6.  Forfeiture and Sentencing

In advance of sentencing, the government moved for mandatory restitution and forfeiture pursuant to Mr. Rudolph's guilty verdict, requesting: (1) $4,877,744.93 in restitution to the insurance companies who paid out Bianca's life insurance policies; (2) forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), of Mr. Rudolph's Paradise Valley, Arizona home, Cranberry Township, Pennsylvania home, Aston Martin and Bentley automobiles, funds from three bank accounts, and interest,

21

dividends, and appreciation on those assets; and (3) a criminal fine of $9,785,577.86. In support of its forfeiture request, the government presented a wealth of financial evidence linking Mr. Rudolph's purchase of the subject assets to the roughly $4.8 million he received from the insurance companies.

Mr. Rudolph opposed the government's motion. As to the forfeiture request, he argued forfeiture was inappropriate because he could have purchased the subject assets notwithstanding the life insurance proceeds and because the commingling of his tainted and untainted funds made it difficult to divide the subject assets as a matter of law. In the end, the district court granted the government's motion with respect to restitution and forfeiture, but reduced the fine to $2 million.

The district court sentenced Mr. Rudolph to life imprisonment on Count 1 (Foreign Murder) and 240 months of imprisonment and three years of supervised release on Count 2 (Mail Fraud), with the sentences to run concurrently.[16]

* * * *

Mr. Rudolph now appeals from his convictions and the forfeiture order. We have jurisdiction over his appeal pursuant to 28 U.S.C. § 1291.

## II. DISCUSSION

On appeal, Mr. Rudolph argues the district court erred by (1) denying his motion for severance; (2) denying his motion for improper venue; (3) admitting at

---

[16] Ms. Milliron, meanwhile, was sentenced to seventeen years of imprisonment for her four convictions.

trial statements Bianca made to Ms. Olmstead shortly before her death; and

(4) ordering forfeiture of his assets. We address each argument in turn, and, finding

them unpersuasive, we uphold the district court's judgment.

## A. Motion for Severance Challenge

In his challenge to the district court's denial of his severance motion,[17] Mr.

Rudolph asserts that the denial materially prejudiced his defense in two ways: (1) it

deprived him of presenting Ms. Milliron's testimony, which would have rebutted

government evidence at trial, and (2) it allowed the jury to hear prejudicial testimony

from two witnesses—Ms. Anders and Ms. Grimley—whose testimony would not

have been admissible in Mr. Rudolph's severed trial.

### 1. Standard of Review and Applicable Law

We review a district court's denial of a motion for severance for abuse of

discretion. *United States v. Pursley*, 577 F.3d 1204, 1215 (10th Cir. 2009). "A

district court abuses its discretion when its decision is 'arbitrary, capricious or

whimsical' or falls outside 'the bounds of permissible choice in the circumstances.'"

---

[17] In a skeletal fashion, Mr. Rudolph argues that the initial joinder of his counts with Ms. Milliron's counts was erroneous under Rule 8(b)—an argument that he raised before the district court. But Mr. Rudolph does not develop this argument at all on appeal. At oral argument, Mr. Rudolph's counsel further clarified that the focus of his appellate challenge was on severance under Rule 14, not joinder under Rule 8(b). Accordingly, we deem any challenge that Mr. Rudolph could have raised to joinder under Rule 8(b) to be waived. *See, e.g.*, *United States v. Woodmore*, 135 F.4th 861, 877 (10th Cir. 2025) ("[A] litigant 'may waive appellate review of an issue by not arguing it—or arguing it in an inadequate manner—in one's opening brief.'" (quoting *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1181 (10th Cir. 2023))).

*United States v. Olea-Monarez*, 908 F.3d 636, 639 (10th Cir. 2018) (quoting *United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006)).  Moreover, "[a] district court abuses its discretion when it relies on an incorrect conclusion of law or a clearly erroneous finding of fact."  *United States v. Hemmelgarn*, 15 F.4th 1027, 1031 (10th Cir. 2021) (quoting *United States v. Battle*, 706 F.3d 1313, 1317 (10th Cir. 2013)); *see also Koon v. United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law."); *United States v. Lopez-Avila*, 665 F.3d 1216, 1219 (10th Cir. 2011) ("An error of law is per se an abuse of discretion.").

Under Federal Rule of Criminal Procedure 14(a), a district court may sever the trials of multiple defendants if a joint trial "appears to prejudice a defendant."  Rule 14 requires a showing of actual prejudice, i.e., "a serious risk that a joint trial would compromise a specific trial right of [the defendant] or prevent the jury from making a reliable judgment about guilt or innocence."  *United States v. Clark*, 717 F.3d 790, 818 (10th Cir. 2013) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).  Such a risk occurs "when the jury considers evidence against a defendant that is admissible only against a co-defendant, and is increased when multiple defendants are tried together 'in a complex case' and 'have markedly different degrees of culpability.'"  *Id.* (quoting *United States v. Sarracino*, 340 F.3d 1148, 1165 (10th Cir. 2003)).  Nevertheless, "[m]erely asserting a heightened chance of acquittal or the negative 'spillover effect' of evidence against a codefendant is insufficient to warrant severance."  *United States v. Martinez*, 76 F.3d 1145, 1152 (10th Cir. 1996) (citation

omitted) (quoting *United States v. Cardall*, 885 F.2d 656, 668 (10th Cir. 1989));

*accord United States v. Jones*, 530 F.3d 1292, 1303 (10th Cir. 2008).

Because severance is a matter of discretion, not of right, defendants face a

heavy burden to establish sufficient prejudice to vacate a conviction on appeal. *See*

*United States v. Hall*, 473 F.3d 1295, 1302 (10th Cir. 2007); *see also Pursley*, 577

F.3d at 1215 ("A defendant seeking to vacate a conviction based upon the denial of a

motion to sever faces a steep challenge."). This heavy burden reflects the strong

preference in federal courts "for joint trials of defendants who are indicted together,"

because joint trials "promote efficiency and 'serve the interests of justice by avoiding

the scandal and inequity of inconsistent verdicts.'" *Zafiro*, 506 U.S. at 537 (quoting

*Richardson v. Marsh*, 481 U.S. 200, 210 (1987)); *accord Hall*, 473 F.3d at 1301–02.

"Rule 14 leaves the determination of risk of prejudice and any remedy for

such prejudice to the sound discretion of the district court[.]" *Clark*, 717 F.3d at 818

(quoting *United States v. Morales*, 108 F.3d 1213, 1220 (10th Cir. 1997)). Thus,

"[t]he district court is the primary referee on severance claims, for we, as an appellate

court, have only a distant view of the ring." *Id.*

"[W]here a defendant bases his motion for severance upon a claim that he

needs a co-defendant's testimony," we apply the following non-exhaustive factors:

> (1) the likelihood that the co-defendant would in fact testify at the
> movant's severed trial and waive his Fifth Amendment privilege;
> (2) the significance of the testimony in relation to the defendant's
> theory of defense; (3) the exculpatory nature and effect of such
> testimony; (4) the likelihood that the co-defendant's testimony
> would be impeached; (5) the extent of prejudice caused by the

absence of the testimony; (6) the effect of a severance on judicial administration and economy; (7) the timeliness of the motion.

*United States v. McConnell*, 749 F.2d 1441, 1445 (10th Cir. 1984). These are known as the "*McConnell* factors." We evaluate the *McConnell* factors in light of *both* the severance motion submitted by the defendant and any corresponding affidavit submitted by the potential co-defendant witness. *See id.* at 1444–46; *Pursley*, 577 F.3d at 1215–19.

## 2. Analysis

The district court did not abuse its discretion by denying Mr. Rudolph's motion for severance. As we explain below, Mr. Rudolph's two severance challenges are each without merit.

### a. Deprivation of Ms. Milliron's Testimony

We evaluate Mr. Rudolph's first severance challenge—that the joint trial deprived him of presenting Ms. Milliron's testimony—under the seven *McConnell* factors. In our assessment, we look to Mr. Rudolph's motion for severance and the corresponding affidavit submitted by Ms. Milliron, *see, e.g.*, *McConnell*, 749 F.2d at 1445, ultimately concluding that the district court did not abuse its discretion by denying Mr. Rudolph's motion for severance. Five of the seven factors weigh against Mr. Rudolph, most notably the low likelihood that Ms. Milliron would have testified in a severed trial, the meager exculpatory value of her testimony, the limited

extent of the prejudice, and the district court's compelling interests in judicial economy. We address each factor below.

### i. Likelihood that Ms. Milliron Would Testify

We conclude that there is a low likelihood that Ms. Milliron would have testified in Mr. Rudolph's severed trial. As a starting point, Mr. Rudolph's motion for severance explained Ms. Milliron's plan to testify as follows:

> Ms. Milliron has invoked her right to a speedy trial to put these trumped-up charges behind her and restore the *status quo ante*. Once that happens, she will again have nothing to fear from testifying truthfully and refuting the testimony of [Ms. Grimley] and [Mr. Lovelace] . . . . Ms. Milliron would not testify in a joint trial but would be *available* in [Mr.] Rudolph's severed trial if it proceeds after her trial.

J.A., Vol. I, at 166–67 (emphasis added). By Mr. Rudolph's own admission in his motion, then, Ms. Milliron's commitment to testify was not unequivocal, but rather conditional on her being tried first and acquitted. Such conditional offers to testify normally undercut the likelihood that a co-defendant will testify in a severed trial. *See, e.g.*, *McConnell*, 749 F.2d at 1445 (explaining that a motion for severance "would not have met the initial requirement of a showing of willingness to testify because [the defendant] conditioned his offer of testimony on his being tried first"); *United States v. Espinosa*, 771 F.2d 1382, 1409 (10th Cir. 1985) (discrediting the likelihood that co-defendants would testify in a severed trial when they "condition[ed] their offer to testify on their case being tried first").[18]

---

[18]     Mr. Rudolph retorts that these statements in his motion should be read only to explain "the well-established procedure for sequencing severed trials."

Ms. Milliron's affidavit does not inspire any greater confidence that she would have testified in a severed trial. In relevant part, she stated:

> Since my testimony, I have learned that the government's case against [Mr. Rudolph] depends on testimony about two conversations in which the government says that I participated. I have first-hand knowledge that no other potential witness has about these supposed conversations. The first alleged conversation is one between a co-worker, [Ms.] Grimley, and me. The second alleged conversation is one between [Mr. Rudolph] and me, parts of which [Mr. Lovelace] claims to have overheard.

> From what I have seen of the government's discovery and through conversations with my lawyer, I have concluded that my recollection of those alleged conversations flatly contradicts and is entirely inconsistent with what Ms. Grimley and [Mr. Lovelace] claim.

> . . . .

> If the allegations and charges against me were tried separately from [Mr. Rudolph's] case, I would be able to testify at [Mr. Rudolph's] trial to correct Ms. Grimley's and [Mr. Lovelace's] false, misleading, and confused recollections of what they think they heard me and/or [Mr. Rudolph] say. I am very sure the jury would believe me over those witnesses because I know what was said.

J.A., Vol. I, at 173 (emphasis and numbering omitted). At no point in her affidavit, however, did Ms. Milliron unconditionally commit to testifying—saying only that she "would be *able to* testify." *Id.* (emphasis added). Suffice it to say, a witness being able to testify is materially different from a witness committing

---

Aplt.'s Opening Br. at 35. But nothing in Mr. Rudolph's statements suggests he was discussing sequencing procedure—nor is it clear why he would be raising such a "well-established" proposition in a motion for severance before the district court.

unconditionally to actually testify.  Moreover, the district court reasonably found that Ms. Milliron's affidavit was "vague and conclusory," *id.* at 211 (quoting *id.* at 193 (Gov.'s Resp. Br., filed Mar. 28, 2022)); specifically, though Ms. Milliron purported to have "first-hand knowledge" that "flatly contradict[ed]" two witnesses' testimony, she offered no substance for those claims, *id.* at 173.  Without more, these affidavit averments by Ms. Milliron do not support Mr. Rudolph's argument on appeal that Ms. Milliron was prepared to offer specific testimony in a severed trial.

Accordingly, the first *McConnell* factor weighs against Mr. Rudolph.

### ii.  Significance of Ms. Milliron's Testimony to Mr. Rudolph's Defense

We conclude that, in a severed trial, Ms. Milliron's testimony would have been significant.  Thus, this factor weighs in Mr. Rudolph's favor.  We understand *McConnell*'s significance factor to turn on whether the proposed testimony is congruent with the defense theory.  *See McConnell*, 749 F.2d at 1445 ("[The co-defendant's] proposed testimony, as evidenced by his affidavit, was at least significant in view of [Defendant's] theory of defense.").

As we interpret her affidavit, Ms. Milliron asserted that she had knowledge of conversations between (1) herself and Mr. Rudolph at Steak 44, overheard by Mr. Lovelace; and (2) herself and Ms. Grimley; and that her knowledge contradicted both Mr. Lovelace's and Ms. Grimley's recollections of those conversations.  But only the Steak 44 conversation is actually relevant to our assessment of the significance of Ms. Milliron's testimony in a severed trial of Mr. Rudolph.  That is so because Ms.

Milliron would not have been permitted to testify regarding the Grimley conversation

at Mr. Rudolph's severed trial.

Recall that the court only admitted Ms. Grimley's testimony regarding her

conversations with Ms. Milliron in the government's case *against Ms. Milliron*.  To

that end, the district court read the following limiting instruction to the jury:

> So, ladies and gentlemen of the jury, [Ms. Grimley] may
> testify that Lori Milliron made certain statements to her in 2015.
> When evaluating *the case against Ms. Milliron*, it is for you to
> decide whether she made any statement and, if so, what weight to
> give whatever statement she made.  However, any statement Ms.
> Milliron may have made to Ms. Grimley are to be considered *only*
> in regards to the charges against Ms. Milliron.
>
> With regard to the charges against Lawrence Rudolph, you
> *cannot consider these alleged statements at all*.  In other words, as
> far as the charges against Dr. Rudolph are concerned, you cannot
> consider any statements Ms. Milliron may have made to Ms.
> Grimley.

J.A., Vol. XIV, at 3465 (Trial Tr., dated July 21, 2022) (emphases added).  It

logically follows from the court's limiting instruction that if Mr. Rudolph had been

tried alone, Ms. Grimley's testimony regarding her conversation with Ms. Milliron

would not have been admissible.  Consequently, in a severed, solo trial of Mr.

Rudolph, there would have been no Grimley testimony for Ms. Milliron to rebut, and

the court would not have permitted such rebuttal testimony by Ms. Milliron.  *See*

Oral Arg. at 6:20–21 (defense counsel stating that the Milliron "affidavit does not

need to undermine the Grimley testimony").  Therefore, in assessing the significance

that Ms. Milliron's testimony would have had in a severed trial of Mr. Rudolph, we

exclude from our analysis her purported rebuttal testimony regarding the Grimley

conversation, because Ms. Grimley's testimony would not have been admissible in a severed trial of Mr. Rudolph.

Therefore, only Ms. Milliron's statement that she would contradict Mr. Lovelace's recollection of Mr. Rudolph's outburst at Steak 44 remains for our analysis.[19]  Though lacking in detail, this assertion would necessarily have been *significant* to Mr. Rudolph's defense.  As Mr. Rudolph points out, Mr. Lovelace's testimony that he overheard Mr. Rudolph admit to murdering his wife was pivotal to the government's case; indeed, the government began its opening statement at trial by forecasting Mr. Lovelace's testimony.  *See* J.A., Vol. VIII, at 1738 ("I want to start at the back bar of the high-end steakhouse in [] Arizona.").  Accordingly, a salient feature of Mr. Rudolph's defense was his contention that he never admitted at Steak

---

[19]    Mr. Rudolph stated in his motion for severance that Ms. Milliron would also offer the following testimony:

> She can show that [Mr.] Rudolph had no reason to kill his wife. He was already wealthy enough to afford exotic vacations, among other luxuries.  His wife knew about his affair with Ms. Milliron. They had been married for 34 years and had two children together. Neither his son nor his daughter has ever believed that he murdered their mother.  Ms. Milliron will also explain that she had no desire to re-marry, that she did not give an ultimatum, and that she was not going to leave [Mr.] Rudolph if he continued in his marriage.

J.A., Vol. I, at 167.  Yet none of this additional testimony appears anywhere in Ms. Milliron's affidavit, so we decline to include it in our analysis.  *See Pursley*, 577 F.3d at 1216 ("We rest our [denial of the motion for severance] upon the *absence*, at the time the motions were filed, of affidavits from [the co-defendants] validating [Defendant's] assertions—that is, . . . identifying the exculpatory content of their testimony.").

44 to murdering his wife. Therefore, the testimony of Ms. Milliron that purportedly would bolster his version of the Steak 44 conversation with first-hand knowledge would have been significant. However, the significance factor does not set a high bar; the evidence at issue simply must be congruent with the defense theory. In particular, it does not necessarily follow that the same evidence—even if significant in this limited sense—could be deemed exculpatory, which is the subject of the next *McConnell* factor.

Suffice it to say here that the second *McConnell* factor weighs in favor of Mr. Rudolph.

### iii. Exculpatory Nature and Effect of Ms. Milliron's Testimony

We conclude that Ms. Milliron's testimony would not have been exculpatory in a solo, severed trial of Mr. Rudolph. For essentially the same reasons outlined *supra* for why Ms. Milliron's knowledge concerning her conversation with Ms. Grimley is not relevant to our analysis of *McConnell*'s significance factor, it also is not relevant to our analysis of *McConnell*'s exculpatory nature and effect factor. In other words, the focus of our analysis here is solely on Mr. Milliron's proffered testimony regarding her Steak 44 conversation with Mr. Rudolph and, more specifically, her sworn assertion that her testimony would contradict the testimony of Mr. Lovelace. Recall that Mr. Lovelace testified that Mr. Rudolph told Ms. Milliron,

32

"I killed my [fuck]ing wife for you," prompting her to leave Steak 44 looking embarrassed.  J.A., Vol. XVI, at 4116, 4119.

Ms. Milliron's affidavit averred that her recollection of that conversation "flatly contradict[ed]" Mr. Lovelace's testimony.  J.A., Vol. I, at 173.  Critically, however, Ms. Milliron's affidavit provided the district court with nothing more.  She did not explain the context of the Steak 44 conversation, tell the court what Mr. Rudolph in fact said to her, or shed *any* additional light on the conversation.  Nor did her affidavit specifically support Mr. Rudolph's explanation at trial for the Steak 44 outburst: that he had in fact said, "*Now they're saying* I killed my [fuck]ing wife for you."[20]  *See* J.A., Vol. XVIII, at 4581 (emphasis added).

On its face, the statement in Ms. Milliron's affidavit is conclusory, bereft of substance, and can hardly be deemed *exculpatory* to the degree required by our precedent to justify a severed trial.  *See Pursley*, 577 F.3d at 1217 (concluding that a co-defendant's statement in an affidavit lacked exculpatory value because it merely "provided a naked factual assertion" that was "insufficient on its face to undercut the

---

[20]    Even if Ms. Milliron had expressly adopted Mr. Rudolph's version of his Steak 44 statement, it likely would have been of only limited exculpatory value. That is because that version of events was rebutted by Mr. Swanepoel's testimony that he told Mr. Rudolph of the FBI investigation into Bianca's murder *only after* Mr. Rudolph's outburst in Steak 44.  In other words, Mr. Swanepoel's testimony would have indicated that Mr. Rudolph would not have been aware of anyone accusing him of killing his wife for Ms. Milliron at the time of the Steak 44 outburst, and therefore, a reasonable jury could infer that Mr. Rudolph must have fabricated his account of this outburst. *Cf. Hall*, 473 F.3d at 1302 (concluding that the proffered testimony was not sufficiently exculpatory because "wiretap evidence directly contradicts it"); *see also supra* note 9.

criminal liability of [Defendant]" (emphasis omitted)); *McConnell*, 749 F.2d at 1446 (explaining that "[w]hile the proffered [] testimony does purport to be exculpatory, we find that it lacks substance" because it would "be little more illuminating than a simple assertion that [Defendant] was innocent"); *Hall*, 473 F.3d at 1302 (affirming the denial of a motion for severance in part because the proffered "testimony completely lacks any substance or credibility" (internal quotation marks omitted)); *Martinez*, 76 F.3d at 1152–53 (agreeing with the district court's finding that the "purported testimony lacked substance, was cumulative of defendant's own testimony, and too self-serving to be credible" (footnote omitted)).  Therefore, although *significant* to Mr. Rudolph's defense, Ms. Milliron's purported testimony was *not* sufficiently *exculpatory* to militate in favor of severed trials.  *See McConnell*, 749 F.2d at 1445–46 (concluding that a co-defendant's testimony was significant but not exculpatory).

The third *McConnell* factor thus weighs against Mr. Rudolph.

### iv.  Likelihood of Impeachment of Ms. Milliron's Testimony

Ms. Milliron's testimony would likely have been impeached at a severed trial. Ms. Milliron and Mr. Rudolph's romantic relationship—both before and after Bianca's death—was well documented at trial and perhaps most prominently displayed in the pair's salacious email exchanges.  And Ms. Milliron's lifestyle after Bianca's death, including her frequent vacations to Cabo, was shown through the evidence to be dependent on her relationship with Mr. Rudolph.  Given her romantic ties to Mr. Rudolph, which brought her tangible, life-style benefits, the jury would

34

likely have approached Ms. Milliron's testimony seeking to exculpate Mr. Rudolph with a healthy dose of skepticism. *See United States v. Green*, 818 F.3d 1258, 1280–81 (11th Cir. 2016) ("[A] codefendant's proffered testimony in favor of the moving defendant is of 'dubious credibility' when 'it was in no way contrary to the [co-defendant's] own interests.'" (second alteration in original) (quoting *United States v. Pepe*, 747 F.2d 632, 651 (11th Cir. 1984))); *Martinez*, 76 F.3d at 1153 (agreeing with the district court that the proffered testimony of a co-defendant was "too self-serving to be credible"); *cf. Olden v. Kentucky*, 488 U.S. 227, 231–32 (1988) (confirming the Confrontation Clause right to impeach a witness with their motive to lie to protect a romantic relationship).

Furthermore, if Ms. Milliron had been tried first and convicted—as she ultimately was on four of the seven counts in the joint trial—her prior convictions would have been admissible in Mr. Rudolph's trial for impeachment purposes. *See* Fed. R. Evid. 609. Those convictions would have considerably damaged Ms. Milliron's credibility in the eyes of a reasonable jury. *See McConnell*, 749 F.2d at 1446 ("[H]ad [the co-defendant] been tried first . . . and had he been convicted, the fact of that conviction would also have been admissible and would have effectively nullified the exculpatory value of his testimony for [Defendant].").

The fourth *McConnell* factor weighs against Mr. Rudolph.

### v. Extent of Prejudice

Mr. Rudolph was minimally prejudiced, if at all, by the district court's authorization of a joint trial. Rule 14 prejudice requires "a serious risk that a joint

35

trial would compromise a specific trial right of [the defendant] or prevent the jury from making a reliable judgment about guilt or innocence." *Clark*, 717 F.3d at 818 (quoting *Zafiro*, 506 U.S. at 539). Mr. Rudolph does not direct us to any specific trial right that was compromised aside from the denial of his right to present witnesses (i.e., Ms. Milliron) in his own defense, a right subsumed by our analysis of the *McConnell* factors. And the absence of Ms. Milliron's testimony from the joint trial did not prevent the jury from making a reliable judgment regarding Mr. Rudolph's guilt or innocence. That is because, by Mr. Rudolph's own admission, much of Ms. Milliron's testimony was duplicative of his own. *See* J.A., Vol. I, at 166 ("Her testimony will corroborate every other statement made by [Mr.] Rudolph . . . that his wife died from an accident."). More specifically, based on her affidavit, the only purportedly exculpatory testimony Ms. Milliron could have offered—her recollection of the Steak 44 conversation—would at best only parrot Mr. Rudolph's own version of that conversation that he offered at trial.

We recognize that Ms. Milliron's testimony could have bolstered Mr. Rudolph's defense in a solo, severed trial. Specifically, we acknowledge that a jury's opportunity to hear the testimony of a corroborative witness—even if that witness only parrots the defendant's own testimony—can still be favorable to the defendant. But the generalized notion that a defendant had "a better chance of acquittal in a separate trial" is not sufficient to establish prejudice under Rule 14. *Jones*, 530 F.3d at 1303 (quoting *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005)). And critically, where proposed testimony lacks substance—as Ms. Milliron's did here—

36

the extent of prejudice that can arise from the absence of that testimony is low. *See, e.g.*, *Pursley*, 577 F.3d at 1216 ("The district court aptly determined that the proposed testimony lacked the requisite substance to generate prejudice." (internal quotation marks omitted)).

The fifth *McConnell* factor also weighs against Mr. Rudolph.

### vi.  Judicial Administration and Economy

A severed trial of Mr. Rudolph would have burdened judicial administration and economy.  No shortage of cases support the proposition that, typically, severed trials strain judicial resources. *See, e.g.*, *Pursley*, 577 F.3d at 1218–19 ("Granting severance also would have thwarted principles of judicial economy.  The district court would have been required, at a minimum, to conduct two four-day trials, rather than just one."); *McConnell*, 749 F.2d at 1446 ("[T]he trial court was entirely justified in considering the prejudice caused to [the defendant] by a denial of severance to be very small and greatly outweighed by the expense and administrative inconvenience of conducting two lengthy trials involving numerous witnesses rather than one consolidated trial.").

Ordinarily, we defer to the district court's own analysis of how severance would impact the court and its staff. *Cf. Clark*, 717 F.3d at 818 ("The district court is the primary referee on severance claims, for we, as an appellate court, have only a distant view of the ring.").  As the district court explained:

> [T]he Court wholly rejects [Mr.] Rudolph's argument that "[s]everance will have a minimal, if any, effect on judicial economy."  The Court considers this argument to border on

frivolous as it lacks any recognition of the demanding workload of a district judge in the District of Colorado, as well as the difficulties of scheduling and holding trials during the COVID-19 pandemic. This case is not only unusually complicated, it has already proven to be very court resource intensive as well. The trial against [Mr.] Rudolph alone is already expected to last about three weeks and will involve dozens of witnesses, including international witnesses. . . . Because a trial against Defendants Rudolph and Milliron will include much of the same presentation of evidence, the Court concludes that a joint trial would result in considerable efficiencies in the expenditure of scarce judicial resources, and as a result this fact alone weighs heavily against severance.

J.A., Vol. I, at 213–14 (third alteration in original) (footnote omitted) (citations omitted). We find this analysis persuasive.

The sixth *McConnell* factor weighs against Mr. Rudolph.

### vii.  Timeliness of Mr. Rudolph's Motion for Severance

The parties do not dispute, and the district court agreed, that Mr. Rudolph's motion for severance was timely.

The seventh *McConnell* factor therefore weighs in favor of Mr. Rudolph.

### viii.    Summary of the *McConnell* factors

Based on our consideration of the *McConnell* factors, we conclude that the district court did not abuse its discretion in rejecting Mr. Rudolph's first line of argument for severance—that failure to sever unduly deprived him of Ms. Milliron's testimony. Five of the *McConnell* factors weigh against Mr. Rudolph, and only two weigh in his favor. Significantly, the factors that our precedents treat as most important—*viz.*, likelihood that the co-defendant would testify, exculpatory value, extent of prejudice, and judicial economy—weigh against Mr. Rudolph. *See Pursley*,

38

577 F.3d at 1215–19; *Hall*, 473 F.3d at 1302; *McConnell*, 749 F.2d at 1445–46.

Therefore, we conclude that the district court did not abuse its discretion in rejecting Mr. Rudolph's first line of argument for severance—which effectively prevented Mr. Rudolph's co-defendant, Ms. Milliron, from testifying in a severed trial.[21]

### b.  Testimony from Ms. Anders and Ms. Grimley

Mr. Rudolph also insists the joint trial prejudiced him because it allowed the jury to hear certain testimony from two witnesses—Ms. Anders and Ms. Grimley— that would not have been admissible in Mr. Rudolph's severed trial.  Ms. Anders and Ms. Grimley each presented testimony regarding their conversations with Ms. Milliron prior to Bianca's death.  In those conversations, Ms. Milliron purportedly explained that Mr. Rudolph frequently bought gifts for her and took her on exotic

---

[21]      Embedded in Mr. Rudolph's first severance argument is a challenge to a footnote in the district court's order denying his motion for severance, in which the district court noted that Mr. Rudolph could "waive his Fifth Amendment privilege against self-incrimination to testify regarding his recollections of certain conversations and the nature of his relationship with [Ms.] Milliron."  J.A., Vol. I, at 212 n.3; *see supra* note 13.  Mr. Rudolph intimates that this footnote violated his privilege against self-incrimination, but more prominently contends that whether he could have testified at trial was not a proper factor for the court to consider in ruling on his severance motion and, by considering this factor, the court abused its discretion.  *See* Aplt.'s Opening Br. at 40–41.  However, as the government points out, any potential error associated with the court's brief footnote remark was harmless: constituting at best a brief aside, the short footnote was not the district court's basis for denying severance, which the court fulsomely explained—through references to the *McConnell* factors and otherwise—in over six pages of its opinion. *Cf. United States v. Ellis*, 868 F.3d 1155, 1172 (10th Cir. 2017) (explaining that harmless error occurs when "the error complained of did not contribute to the verdict obtained" (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999))).  Accordingly, we see no need to discuss this footnote further.

vacations, that they planned to build a dream home together, that she disliked Bianca, and that she gave Mr. Rudolph an ultimatum of her own—"get rid of" Bianca, or Ms. Milliron would break off the affair. J.A., Vol. XIV, at 3467. Mr. Rudolph maintains that this testimony—though presented solely in the government's case against Ms. Milliron—suggested to the jury that Mr. Rudolph had a motive to kill Bianca, namely, to maintain his relationship with Ms. Milliron.

Yet, any potential prejudice stemming from this testimony was dispelled by the district court's limiting instructions. *See Jones*, 530 F.3d at 1303 ("[I]n the context of joint trials, 'limiting instructions [] often will suffice to cure any risk of prejudice.'" (second alteration in original) (quoting *Zafiro*, 506 U.S. at 539)); *see also United States v. Herrera*, 51 F.4th 1226, 1273 (10th Cir. 2022) ("Even if actual prejudice exists, the court can often cure the prejudice through 'less drastic measures, such as limiting instructions.'" (quoting *Zafiro*, 506 U.S. at 539)). Before Ms. Anders and Ms. Grimley testified regarding their conversations with Ms. Milliron, the district court instructed the jury that it could not consider their testimony in evaluating the government's case against Mr. Rudolph. Those limiting instructions served to address the evil at the heart of Mr. Rudolph's challenge—that the jury would use that testimony in establishing his guilt.

As a matter of law, we presume that jurors follow the instructions they are given. *See Stouffer v. Duckworth*, 825 F.3d 1167, 1181 (10th Cir. 2016); *United States v. Fleming*, 667 F.3d 1098, 1106 (10th Cir. 2011). As such, we presume the jury understood and accepted the court's direction that Ms. Anders's and Ms.

Grimley's testimony had no bearing on Mr. Rudolph's guilt.  Moreover, we have consistently held that the harm posed by "spillover effects" from evidence presented against a co-defendant is insufficient to demonstrate prejudice.  *See Martinez*, 76 F.3d at 1152; *Clark*, 717 F.3d at 818; *Jones*, 530 F.3d at 1303; *United States v. Morgan*, 748 F.3d 1024, 1043 (10th Cir. 2014).  Mr. Rudolph's challenge is predicated on precisely the sort of  "spillover effects" theory we have rejected in the past.

Accordingly, as to Mr. Rudolph's second severance challenge, we conclude that the district court did not abuse its discretion.

\* \* \* \*

In sum, the district court did not abuse its discretion in denying Mr. Rudolph's motion for severance.[22]

### B.  Improper Venue Challenge

Mr. Rudolph seeks reversal of the district court's order denying his motion for improper venue.  He maintains that the allegations in Count 1 of the Indictment (Foreign Murder) had no connection to Colorado and that he himself lacked any ties to Colorado.[23]  Recognizing that venue under 18 U.S.C. § 3238 is only proper in the

---

[22]    For the same reasons that we rely on in reaching that conclusion, we hold the district court did not abuse its discretion by denying Mr. Rudolph's subsequent motions calling on the court to reconsider its severance ruling.

[23]    Mr. Rudolph has not argued before the district court or on appeal that venue was improper for the mail fraud offense charged against him in Count 2, which by the indictment's terms involved a fraudulent scheme "within the state and district of Colorado and elsewhere" and the delivery of insurance documents "for the purpose

place where a defendant is "arrested" or "first brought," Mr. Rudolph argues that the District of Colorado was an improper venue for Count 1 because he was "arrested" in Mexico, where jurisdiction cannot exist, and "first brought" to Atlanta, where he initially landed after returning from Zambia. Thus, Mr. Rudolph asserts that the Northern District of Georgia was the only proper venue for his trial.

### 1. Standard of Review and Applicable Law

We review de novo a district court's interpretation of the venue statute. *Pierce v. Shorty Small's of Branson Inc.*, 137 F.3d 1190, 1191 (10th Cir. 1998).

Article III of the United States Constitution tasks Congress with establishing venue for the trial of extraterritorial crimes. *See* U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes, . . . shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed."). Heeding this call, Congress enacted 18 U.S.C. § 3238, which provides: "The trial of all offenses begun or committed . . . out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought[.]" Consequently, for an extraterritorial crime—like Foreign Murder under 18 U.S.C. § 1119—venue is proper where a defendant is (1) arrested, or (2) first brought.

---

of executing the scheme" to an address in Englewood, Colorado. J.A., Vol. I, at 96–97 (Superseding Indictment, dated Feb. 9, 2022). Accordingly, we have no occasion to consider the propriety of venue for Count 2.

## 2. Analysis

Venue for Mr. Rudolph's Foreign Murder charge was proper in the District of Colorado under either venue provision of § 3238. That is, Mr. Rudolph was both "arrested" in, and "first brought" to, the District of Colorado. So we reject Mr. Rudolph's improper venue challenge.

### a. Where Mr. Rudolph was Arrested

The meaning of the term "arrested" in § 3238 is a matter of first impression in our circuit. But our sibling circuits have weighed in, interpreting § 3238's use of the word "arrested" to dictate that venue is proper in the district where the defendant "is first restrained of his liberty in connection with the offense charged." *United States v. Erdos*, 474 F.2d 157, 160 (4th Cir. 1973); *see United States v. Catino*, 735 F.2d 718, 724 (2d Cir. 1984); *United States v. Wharton*, 320 F.3d 526, 536–37 (5th Cir. 2003); *United States v. Ghanem*, 993 F.3d 1113, 1122 (9th Cir. 2021); *United States v. Slatten*, 865 F.3d 767, 786–87 (D.C. Cir. 2017). Notably, at least one circuit has held that the "arrested" provision of § 3238 "applies only if the defendant is already *inside* a district when first restrained of liberty in connection with the offense." *Ghanem*, 993 F.3d at 1122.

We join the Second, Fourth, Fifth, Ninth, and D.C. Circuits in interpreting "arrested" under § 3238 to mean that venue is proper in the district where the defendant "is first restrained of his liberty in connection with the offense charged." *Erdos*, 474 F.2d at 160. That meaning comports with the plain text of § 3238, which sets forth that the venue for "[t]he trial of all *offenses*" shall be "in the district in

43

which the [defendant] . . . is arrested." (emphasis added).  Specifically, this text contemplates a nexus between the charged offense and the place of arrest.

With this definition in mind, we turn to the facts of Mr. Rudolph's case.  The extraterritorial offense for which Mr. Rudolph was charged was Foreign Murder under 18 U.S.C. §§ 1119 and 1111.  Mr. Rudolph was first "arrested" for Foreign Murder—or restrained of his liberty in connection with that charge—in Denver, Colorado.  The unrebutted evidence is that the FBI arranged with Mexican authorities to detain and deport Mr. Rudolph from Cabo, Mexico, to Denver, Colorado, but that he was not *arrested* for Foreign Murder until he arrived at Denver International Airport.

Mr. Rudolph offers no record support for his assertion that he was arrested in Mexico.  Moreover, even assuming *arguendo* that Mr. Rudolph was first "arrested" in Mexico, the record reflects that Mr. Rudolph was not charged with Foreign Murder until he was on the plane heading toward Denver.  In other words, Mr. Rudolph was detained and deported with only his Mail Fraud charge pending but was arrested in Denver for both the Mail Fraud *and* Foreign Murder charges.  Therefore, Mr. Rudolph could not have been arrested for the predicate extraterritorial crime necessary for venue under § 3238—Foreign Murder—until he arrived in Denver.  *See Wharton*, 320 F.3d at 536 (finding that venue was proper for a defendant's foreign murder charge in the Western District of Louisiana, even though the defendant was first arrested in the Middle District of Florida for insurance fraud, because he was later transferred to the Western District of Louisiana, where he was arrested for

44

foreign murder); *Catino*, 735 F.2d at 724 (finding venue for a defendant's passport violations proper in the Southern District of New York, even though he was first arrested in the Eastern District of New York for narcotics trafficking, because he was later transferred to the Southern District of New York, where he was indicted and arrested for the passport offense).

Because Mr. Rudolph was "arrested" for purposes of § 3238 in Denver, Colorado, venue for his trial was proper in the District of Colorado.

### b. Where Mr. Rudolph was First Brought

Even if venue could not properly rest on the "arrested" provision of § 3238 (it can), venue in the District of Colorado would still be proper because Mr. Rudolph was—within the meaning of § 3238—"first brought" to the District of Colorado.

We interpret "first brought" under § 3238 to mean "first brought *in custody*" from outside the United States. *See Erdos*, 474 F.2d at 161. The term "brought" implies an involuntary act and thus implicitly involves a situation where law enforcement is restraining a defendant and returning him to the country. *See United States v. Townsend*, 219 F. 761, 762 (S.D.N.Y. 1915) ("The difference between 'brought' and 'found' is the difference between presence [in the United States] by involuntary and voluntary act. By 'brought' is meant taken, or carried."). Embracing this analysis, other circuits have echoed the view that the "first brought" provision of § 3238 means "first brought in custody." *See Erdos*, 474 F.2d at 161 ("'First brought' within the context of [§ 3238] means first brought *in custody* with liberty restrained."); *Ghanem*, 993 F.3d at 1121–22 ("The district a defendant is first brought

45

to is the district into which the defendant first comes '[from outside the United States' jurisdiction] while in custody.'" (alteration in original) (quoting *United States v. Liang*, 224 F.3d 1057, 1060 (9th Cir. 2000))); *Catino*, 735 F.2d at 724 ("'[F]irst brought[]' [] applies only in situations where the offender is returned to the United States already in custody.").

Here, Mr. Rudolph was "first brought" under § 3238 to the District of Colorado. The FBI arranged for Mr. Rudolph to be detained and deported from Cabo to Denver—thus placing him *in custody*[24] and restraining him of his liberty. Arguing otherwise, Mr. Rudolph suggests the Northern District of Georgia is where he was "first brought" because he landed in Atlanta right after he arrived from Africa. But Atlanta is not where Mr. Rudolph was first brought *while in custody*, and we cannot reasonably construe the statute to mean that "first brought" allows venue to be properly established where a defendant first voluntarily arrives after a non-custodial return trip to the United States from overseas.

Accordingly, even if venue under the "arrested" provision of § 3238 were not proper (it was), venue in the District of Colorado would have still been proper over

---

[24]    Mr. Rudolph recognizes on appeal that he was placed in custody in Mexico when he was detained and deported to the United States. *See* Aplt.'s Opening Br. at 60 (acknowledging that Mr. Rudolph was taken "into custody" in "Mexico, not Colorado"); *see also Physical Custody*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("Custody of a person . . . whose freedom is directly controlled and limited."); *United States v. Han*, 199 F. Supp. 3d 38, 46–51 (D.D.C. 2016) (finding a defendant was "in custody" for purposes of the "first brought provision" of § 3238 where his freedom was directly controlled or limited).

Mr. Rudolph's trial because he was—within the meaning of § 3238—"first brought" to the District of Colorado.

* * * *

In sum, under § 3238, the District of Colorado was the appropriate venue for Mr. Rudolph's trial.[25]

## C. Evidentiary Challenge

Mr. Rudolph's penultimate challenge is to the district court's admission at trial of statements Bianca made to Ms. Olmstead in 2016.  The district court admitted six of these statements under Federal Rule of Evidence 804(b)(6).  On appeal, Mr. Rudolph argues the admission of these statements was erroneous because there was no evidence that Mr. Rudolph killed Bianca to prevent her from testifying in a future divorce proceeding or in the Safari Club litigation.[26]

### 1.  Standard of Review and Applicable Law

"We review a [district] court's evidentiary rulings for an abuse of discretion, according 'deference to a district court's familiarity with the details of the case and

---

[25]     Mr. Rudolph argues vigorously that the government engaged in forum shopping when it arranged to deport him from Cabo to Denver.  However, that argument is immaterial to our venue analysis.  The FBI admitted that it waited for Mr. Rudolph to travel to Mexico in order to deport him to Denver and thereby create the basis for venue in the District of Colorado.  But Mr. Rudolph does not direct us to any case in which the government's deportation of a defendant from overseas to a district of its choosing rendered venue in that chosen district improper under § 3238.  Accordingly, we consider Mr. Rudolph's forum shopping complaint to be of no moment in our venue analysis, and we do not consider the matter further.

[26]     In his opening brief, Mr. Rudolph identifies *ten* statements made by Ms. Olmstead at trial that, in his view, constituted inadmissible hearsay.  But his sole

its greater experience in evidentiary matters.'" *Frederick v. Swift Transp. Co.*, 616 F.3d 1074, 1083 (10th Cir. 2010) (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008)); *accord United States v. Isabella*, 918 F.3d 816, 836 (10th Cir. 2019). "Under this standard, we will not disturb a trial court's decision unless we ha[ve] a definite and firm conviction that the [trial] court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Merritt*, 961 F.3d 1105, 1111 (10th Cir. 2020) (alterations in original) (internal quotation marks omitted) (quoting *United States v. Leonard*, 439 F.3d 648, 650 (10th Cir. 2006)).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. Federal Rule of Evidence 804(b)(6), known as the "forfeiture by wrongdoing exception," provides an exception to the Sixth Amendment's general rule. *See Davis v. Washington*, 547 U.S. 813, 833 (2006) ("[T]he rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on

---

argument on appeal is that the district court erred in admitting Ms. Olmstead's testimony under Rule 804(b)(6). At trial, the district court only admitted *six* statements under Rule 804(b)(6). As a result, Mr. Rudolph has waived by way of inadequate briefing any challenge to the admissibility of statements beyond the six admitted by the district court under Rule 804(b)(6), as he fails to explain why the district court erred in admitting any additional statements. *See Woodmore*, 135 F.4th at 877 (discussing appellate-briefing waiver). For that reason, we evaluate only the six statements admitted under Rule 804(b)(6).

essentially equitable grounds." (omission in original) (quoting *Crawford v. Washington*, 541 U.S. 36, 62 (2004))).

Specifically, Rule 804(b)(6) provides an exception to the hearsay rule under the following circumstances:

> **Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability.**  A statement offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result.

Fed. R. Evid. 804(b)(6).  As relevant here, to admit a statement under Rule 804(b)(6), the government must prove by a preponderance of the evidence that: (1) the defendant caused the witness to be unavailable; and (2) the defendant did so with the intention of making the witness unavailable.  *See United States v. Dhinsa*, 243 F.3d 635, 653–54 (2d Cir. 2001); *see also Giles v. California*, 554 U.S. 353, 361, 367 (2008) (acknowledging the intent requirement of the Rule 804(b)(6) admissibility standard).

Ordinarily, the district court must hold a preliminary evidentiary hearing to ascertain if each of the elements of Rule 804(b)(6) is satisfied.  *See United States v. Cherry*, 217 F.3d 811, 815 (10th Cir. 2000).  In that hearing, in order to admit the challenged evidence, the court must find each Rule 804(b)(6) element satisfied by a preponderance of the evidence.  *See* Fed. R. Evid. 104(a); *see also* Fed. R. Evid. 804(b)(6) advisory committee's note to 1997 amendment ("The usual Rule 104(a) preponderance of the evidence standard has been adopted in light of the behavior the new Rule 804(b)(6) seeks to discourage."); *Cherry*, 217 F.3d at 815.  Bearing in mind

our overarching standard of review—abuse of discretion—we will only reverse the district court's admission of the challenged statements under Rule 804(b)(6) if we have a definite and firm conviction that the district court erred in finding the requirements for Rule 804(b)(6) satisfied by a preponderance of the evidence.

The factual findings undergirding the district court's Rule 804(b)(6) ruling are further insulated by a second, deferential layer of clear-error review: "We accept a district court's factual finding that a defendant procured the absence of a witness unless the finding is clearly erroneous." *United States v. Montague*, 421 F.3d 1099, 1102 (10th Cir. 2005). "A factual finding is clearly erroneous 'only if [it] is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made.'" *United States v. Craig*, 808 F.3d 1249, 1255 (10th Cir. 2015) (alteration in original) (quoting *United States v. Mullins*, 613 F.3d 1273, 1292 (10th Cir. 2010)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 573–74.

Where "[t]he court must decide any preliminary question about whether . . . evidence is admissible[,] [it] is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a); *accord Bourjaily v. United States*, 483 U.S. 171,

50

177–78 (1987); *see United States v. Harrison*, 296 F.3d 994, 1003 (10th Cir. 2002)

("[T]o affirm the district court's ruling, we may decide to consider all the evidence at

trial, including evidence not presented at the hearing on the motion in limine.").  For

purposes of Rule 804(b)(6), procuring a witness's unavailability need only *partly*

motivate the defendant.  *See Dhinsa*, 243 F.3d at 654 ("The government need not,

however, show that the defendant's sole motivation was to procure the declarant's

absence; rather, it need only show that the defendant 'was motivated *in part* by a

desire to silence the witness.'" (quoting *United States v. Houlihan*, 92 F.3d 1271,

1279 (1st Cir. 1996))); *see also Montague*, 421 F.3d at 1103 (agreeing with the

district court's analysis, which stated that "wrongdoing was at least partially intended

to procure the declarant, his wife's, unavailability").[27]

Finally, the district court's application of Rule 804(b)(6) is insulated by the

harmless-error doctrine.  *See Dhinsa*, 243 F.3d at 656–58.  If a defendant argues the

admission of testimony under Rule 804(b)(6) violated his Confrontation Clause

rights, we apply constitutional harmless-error principles, under which the government

"must prove beyond a reasonable doubt [that] the error complained of did not

contribute to the guilty verdict."  *United States v. Chavez*, 481 F.3d 1274, 1277 (10th

Cir. 2007) (alteration in original) (quoting *United States v. Burson*, 952 F.2d 1196,

---

[27]    As relevant here, even though the government primarily theorized at trial that Mr. Rudolph killed Bianca to collect her life insurance proceeds and live happily with Ms. Milliron, the requirements of Rule 804(b)(6) would be satisfied if Mr. Rudolph *also* killed Bianca to prevent her from offering testimony in a future divorce proceeding.

1201 (10th Cir. 1991)).  Conversely, if a defendant objects based solely on the theory that the court misapplied Rule 804(b)(6), we apply non-constitutional harmless-error principles, under which the government must prove by a preponderance of the evidence that the error did not have "a substantial influence on the outcome [of the trial] or leave[] one in grave doubt as to whether it had such effect."  *United States v. Jean-Pierre*, 1 F.4th 836, 843 (10th Cir. 2021) (quoting *United States v. Roach*, 896 F.3d 1185, 1194–95 (10th Cir. 2018)); *see United States v. Harper*, 118 F.4th 1288, 1300 (10th Cir. 2024).

## 2.  Analysis

We reject Mr. Rudolph's challenge to the district court's admission of the six challenged statements under Rule 804(b)(6).  To admit those statements, the government had to establish by a preponderance of the evidence that: (1) Mr. Rudolph caused Bianca's unavailability by killing her; and (2) he did so with the intention of making her unavailable as a witness.  *See Dhinsa*, 243 F.3d at 653–54.  The district court found both elements satisfied, concluding that Mr. Rudolph killed Bianca and did so to prevent her from testifying in a future divorce proceeding and in the Safari Club litigation.  Mr. Rudolph challenges only the district court's ruling as to the second Rule 804(b)(6) element on appeal, contending that he did not kill Bianca with the intent to prevent her from testifying in either of these proceedings.  Below, we address these rulings as to each proceeding.

### a. Future Divorce Proceeding

The district court admitted four of the six statements under the theory that Mr. Rudolph killed Bianca to prevent her from testifying in a future divorce proceeding.[28] Those four statements were Bianca's assertions that: (1) Mr. Rudolph often signed her name on documents; (2) Mr. Rudolph was good at forging her signature; (3) Mr. Rudolph had written up an agreement specifying that she would get nothing in a divorce and signed her name onto it; and (4) she tried to find the agreement for years and was worried about it.

We conclude that the district court did not abuse its discretion in finding by a preponderance of the evidence that Mr. Rudolph killed Bianca, at least in part, to prevent her from testifying as to these four statements in a future divorce proceeding. The district court could have plausibly found that the four statements, collectively, supported the inference that the couple's purported postnuptial agreement—i.e., the document ostensibly dating from 2000 that Mr. Rudolph entered into evidence at

---

[28]     Mr. Rudolph argues that the district court was wrong to consider a divorce proceeding in its Rule 804(b)(6) analysis in the first place because no such proceeding had yet been initiated. But adopting Mr. Rudolph's interpretation of the scope of the rule would yield perverse incentives—rewarding defendants who murder a witness before a proceeding commences by excluding them from application of the rule. We do not read Rule 804(b)(6) to strictly require an ongoing, contemporaneous proceeding in which the witness would testify. *See Houlihan*, 92 F.3d at 1280 ("We see no justification [for purposes of the forfeiture by wrongdoing exception] . . . for distinguishing between a defendant who assassinates a witness on the eve of trial and a potential defendant who assassinates a potential witness before charges officially have been brought."); *accord Dhinsa*, 243 F.3d at 652; *see also Diaz v. United States*, 223 U.S. 442, 458 (1912) ("Neither in criminal nor in civil cases will the law allow a person to take advantage of his own wrong.").

trial—was a fraudulent document upon which Mr. Rudolph forged Bianca's signature. Interpreted in this way, Bianca's testimony could have led to the nullification of the alleged postnuptial agreement altogether in a future divorce proceeding. The district court's finding that Mr. Rudolph killed Bianca, at least in part, to prevent her from offering this testimony in a future divorce proceeding, was not clearly erroneous.

Three salient pieces of evidence from trial support our conclusion that the district court's finding is not clearly erroneous. *First*, Ms. Anders testified that Ms. Milliron told her that Mr. Rudolph could not get divorced because Bianca would take everything he had—including his dental practice and his wealth—in a divorce.[29] Notably, Ms. Anders's conversation with Ms. Milliron took place at some point after August 2008, whereas the purported postnuptial agreement was signed in 2000. The district court could plausibly have inferred from this testimony that Ms. Milliron did not understand from Mr. Rudolph that his assets were protected from Bianca's divorce claims by a postnuptial agreement, even after August 2008—casting doubt on the validity of the 2000 postnuptial agreement. Killing Bianca would have been a

---

[29]    Though Ms. Anders's testimony was only admissible against Ms. Milliron at trial on the substantive question of guilt, we nonetheless consider her testimony in reviewing the district court's Rule 804(b)(6) ruling because the district court is generally unbound by the strictures of the Federal Rule of Evidence for preliminary evidentiary rulings. *See* Fed. R. Evid. 104(a); *Bourjaily*, 483 U.S. at 177–78; *Harrison*, 296 F.3d at 1003.

way for Mr. Rudolph to ensure that she was not available to raise these doubts about the 2000 postnuptial agreement in a divorce proceeding.

*Second*, around 2010, Mr. Rudolph asked his friend, Joseph Smith, about the possibility of signing a postnuptial agreement with Bianca even though, according to Mr. Rudolph, the couple had already executed such an agreement a decade prior. This testimony, too, suggests that Mr. Rudolph was uncomfortable with the validity of the purported 2000 postnuptial agreement.

*Third*, James Padish, a former Arizona state court judge and an expert in family law, testified that it was unlikely that the postnuptial agreement was authentic or enforceable.  Once again, this testimony suggests that the purported 2000 postnuptial agreement was invalid and would not have passed scrutiny in a divorce proceeding.  The district court could have plausibly found that, unless she was unavailable, Bianca's testimony would have underscored this fact of invalidity and, consequently, Mr. Rudolph decided to kill her—at least in part—so that she would not be available.

We conclude that the district court would not have abused its discretion in finding that these three salient pieces of evidence[30] were sufficient to establish by a preponderance of the evidence that Mr. Rudolph killed Bianca in part to prevent her

---

[30]     The government invites us to consider additional evidence from Ms. Olmstead herself, but we decline to do so given the circular nature of the government's request—that is, relying on Ms. Olmstead's testimony to determine if that same testimony is admissible.

from testifying in a future divorce proceeding about facts that would highlight the possibly fraudulent nature of the 2000 postnuptial agreement.[31]   Therefore, the district court did not abuse its discretion in admitting at trial under Rule 804(b)(6) the first four challenged statements through Ms. Olmstead's testimony.

### b. Safari Club Litigation

Next, the district court admitted two of the six statements under the theory that Mr. Rudolph killed Bianca in part to prevent her from testifying in the Safari Club litigation.  Those two statements were Bianca's assertions that: (5) she confronted Mr. Rudolph about his affair with Ms. Milliron and that he initially denied the affair before he admitted to it when confronted with the emails; and (6) Mr. Rudolph

---

[31]    On appeal, Mr. Rudolph attacks much of this testimony as unreliable due to the witnesses' alleged lack of credibility.  Instead, he directs us to other testimony that, in his view, established the authenticity of the postnuptial agreement. But our task on appeal is not to reweigh witness credibility.  *See United States v. Chatman*, 994 F.2d 1510, 1518 (10th Cir. 1993) ("The determination of a witness's credibility is a matter for the trial court rather than the appellate court[.]").  Our review is limited to discerning whether there is a plausible view of the evidence that supports the district court's findings; we are not in the business of substituting Mr. Rudolph's or indeed our own plausible view for that of the district court.  *See, e.g.*, *Anderson*, 470 U.S. at 575 ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."); *id.* at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").  Nothing in the record suggests that the district court's credibility findings are implausible or leave us "with a definite and firm conviction" that the district court was mistaken in crediting these witnesses' testimony; accordingly, the court did not clearly err in relying on that testimony.  *See Craig*, 808 F.3d at 1255; *Montague*, 421 F.3d at 1102.

ultimately agreed to break off the affair with Ms. Milliron and fire her from Three Rivers Dental.

Ultimately, we need not address the question of whether the district court erred in admitting these two statements under Rule 804(b)(6) because we conclude that even if the district court erred in admitting them, the government has demonstrated that any error was harmless. The principal import of these statements was cumulative of other evidence: specifically, the principal import of these statements could have been inferred from other statements that the district court properly admitted at trial. For example, the jury permissibly heard Ms. Olmstead's testimony that Bianca had accessed Mr. Rudolph's salacious emails with Ms. Milliron, that she planned to confront him about the affair, and that Mr. Rudolph told Bianca it would take time to fire Ms. Milliron. This evidence established that Bianca knew about the affair and that Mr. Rudolph agreed to sever ties with Ms. Milliron—the very propositions established by the two statements Mr. Rudolph now challenges on appeal. Because the jury would almost certainly have drawn the same factual inferences from the properly admitted evidence as it would have from the challenged statements (which we assume *arguendo* were admitted in error), any error from admitting these challenged statements was necessarily harmless. More specifically, we cannot conclude that any such error substantially influenced or cast doubt on Mr. Rudolph's guilty verdict. *See Jean-Pierre*, 1 F.4th at 843.[32]

---

[32] We apply our less-demanding non-constitutional harmless-error standard because Mr. Rudolph's challenge is premised on the district court's

Furthermore, even if that were not enough to show harmlessness (it is), the

harmlessness of the admission of these two statements is highlighted by the

substantial weight of evidence introduced by the government that strongly pointed

toward Mr. Rudolph's guilt, including the testimony from the firearms and ballistics

---

application of Rule 804(b)(6), and he has not clearly argued—either below or on
appeal—that his Confrontation Clause rights were violated. To obtain constitutional
harmless-error review for an evidentiary challenge, our precedent requires that a
defendant specifically object that the error violated his Confrontation Clause rights.
*See, e.g.*, *United States v. McFadden*, 116 F.4th 1069, 1094 n.8 (10th Cir.
2024) ("[T]he constitutional harmless-error standard applies to hearsay
objections when the defendant claims that the admission of the out-of-court statement
violated his rights under the Confrontation Clause."). As noted, Mr. Rudolph did not
make such a specific objection. True, Mr. Rudolph does make a (single) passing
reference to the Confrontation Clause in his opening brief. *See* Aplt.'s Opening Br.
at 50. But that reference is not accompanied by any claim for relief that is predicated
on the Confrontation Clause. Accordingly, that reference is not enough to preserve
for our review a Confrontation Clause challenge to the court's evidentiary rulings—
which were expressly predicated on Rule 804(b)(6). *See, e.g.*, *In re Syngenta AG
MIR 162 Corn Litig.*, 61 F.4th at 1181. Moreover, even if it could be colorably
contended (it cannot) that Mr. Rudolph has offered us enough argument to overcome
the preservation hurdle, he still would have been obliged to recognize his failure to
raise a Confrontation Clause challenge before the district court and advance his
argument under the plain-error rubric to escape the application of our effective-
waiver doctrine. *See, e.g.*, *Fish v. Kobach*, 840 F.3d 710, 729–30 (10th Cir. 2016).
However, he has not done that. Accordingly, Mr. Rudolph has waived any
Confrontation Clause challenge—including to the admission of the two statements at
issue here—and, accordingly, a constitutional harmless-error standard is not
applicable. And lest there be any doubt, even if we assumed *arguendo* that Mr.
Rudolph could overcome the multiple preservation issues—*viz.*, appellate-briefing
waiver and effective waiver—and present a challenge to the admission of the two
statements warranting constitutional harmless-error review, we would deem the
district court's admission of those statements under Rule 804(b)(6) harmless because
the admission did not "contribute to the guilty verdict" beyond a reasonable doubt.
*Chavez*, 481 F.3d at 1277 (quoting *Burson*, 952 F.2d at 1201). This is because, as
noted above, the import of these statements could easily be inferred by other
testimony the jury heard.

experts, forensic analysts, FBI crime scene experts, and the anthropometrist. The two challenged statements only revealed that Bianca confronted Mr. Rudolph about the affair and that he agreed to end it; that testimony did not in any way undermine the probative value of this other strong (albeit circumstantial) evidence of guilt.

Accordingly, we conclude that any potential error under Rule 804(b)(6) in admitting the two challenged statements under the theory that Mr. Rudolph killed Bianca in part to prevent her from testifying in the Safari Club litigation was harmless.

\* \* \* \*

In sum, we reject Mr. Rudolph's challenge that the district court abused its discretion in admitting six statements Bianca made to Ms. Olmstead under Rule 804(b)(6).

## D. Forfeiture Order Challenge

Mr. Rudolph's last arguments for reversal relate to the district court's forfeiture order. Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the district court ordered Mr. Rudolph to forfeit assets he purchased after he acquired Bianca's life insurance proceeds, including a Paradise Valley, Arizona home; a Cranberry Township, Pennsylvania home; the 2018 Aston Martin DB-11 and 2017 Bentley Bentayga; interest, dividends, and appreciation on these assets; and funds

from three bank accounts.  We conclude that Mr. Rudolph's arguments are without

merit and reject them.

Mr. Rudolph first argues that the district court's forfeiture order was erroneous

because the subject assets were commingled, meaning they were purchased with both

tainted funds (i.e., Bianca's life insurance proceeds) *and* untainted funds (i.e., Mr.

Rudolph's own money).  In his view, because the commingled assets could not be

divided without difficulty, the government was required to seek a money-judgment

forfeiture under the substitute-asset provision, 21 U.S.C. § 853(p).  Second, he claims

the district court erroneously held that the government was entitled to the interest,

dividends, and appreciation from the subject assets.[33]

---

[33]    Mr. Rudolph raises two more challenges to the forfeiture order on
appeal: that the tracing method used for the forfeiture analysis by the government's
auditor was faulty, and that the government intentionally omitted accounting for
untainted funds that contributed to the forfeited assets.  In opposition, the
government contends that Mr. Rudolph waived these arguments by disclaiming them
before the district court.  We agree with the government.  At sentencing, Mr.
Rudolph's counsel stated:

> The issue in this case . . . is not whether the proceeds-first
> approach [i.e., the tracing method] is not an accepted or recognized
> accounting practice, or not whether the deputy took a liberal or a
> conservative approach in trying to do this tracing, or not whether
> the percentages [i.e., of tainted and untainted funds] should have
> been more or less in those charts.  The point of all this is that this is
> an extremely, extremely complicated method and attempt to trace this
> money.

J.A., Vol. V, at 1268 (Tr. of Sent'g Hr'g, held Aug. 21, 2023).  By this statement,
Mr. Rudolph advised the district court that the tracing methods and questions about
the percentages of tainted and untainted funds were not before the court for decision.
But those precise challenges are the ones that Mr. Rudolph now raises on appeal.  By
disclaiming these arguments before the district court, Mr. Rudolph waived them.  *See*

### 1.  Standard of Review and Applicable Law

"Forfeiture is an element of the sentence imposed following conviction . . . ."
*United States v. Bader*, 678 F.3d 858, 893 (10th Cir. 2012) (omission in original)
(quoting *Libretti v. United States*, 516 U.S. 29, 38–39 (1995).  Consequently, we
review the district court's forfeiture order as we would any other sentencing
determination—that is, "we review its legal conclusions de novo and its factual
findings for clear error."  *Id.*; *accord United States v. Arnold*, 878 F.3d 940, 942
(10th Cir. 2017).

Mail fraud proceeds are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C)
and 28 U.S.C. § 2461(c), even though § 981 is a civil forfeiture provision.  *See*
*United States v. Courtney*, 816 F.3d 681, 685–86 (10th Cir. 2016).  Under
§ 981(a)(1)(C), property subject to forfeiture includes "[a]ny property, real or
personal, which constitutes or is derived from proceeds traceable to [the] violation."
The government carries the burden of establishing by a preponderance of the
evidence that the property subject to forfeiture has a sufficient nexus to the offense
charged.  *See, e.g.*, *United States v. Wright*, 49 F.4th 1221, 1227 (9th Cir. 2022);
*United States v. Garbacz*, 33 F.4th 459, 472 (8th Cir. 2022).

---

*United States v. Egli*, 13 F.4th 1139, 1144 (10th Cir. 2021) (explaining waiver by
abandonment "occurs when a party deliberately considers an issue and makes an
intentional decision to forgo it" (quoting *United States v. Malone*, 937 F.3d 1325,
1327 (10th Cir. 2019))).  Also, Mr. Rudolph only skeletally raises these challenges in
his appellate brief; so, he has doubly waived the arguments by also doing so under
our briefing-waiver doctrine.  *See Woodmore*, 135 F.4th at 877.

"The substitute-asset provision, 21 U.S.C. § 853(p), provides the only method for the forfeiture of untainted property." *United States v. Channon*, 881 F.3d 806, 811 (10th Cir. 2018); *see Honeycutt v. United States*, 581 U.S. 443, 451 (2017). Under this provision, if a defendant has "commingled" forfeitable property "with other property which cannot be divided without difficulty . . . the court shall order the forfeiture of *any other property* of the defendant"—that is, the government shall take "[s]ubstitute property" up to the value of the forfeitable proceeds. 21 U.S.C. § 853(p)(1)(E), (2) (emphasis added) (bold typeface omitted).

## 2. Analysis

The district court properly ordered forfeiture of (1) assets Mr. Rudolph purchased after acquiring Bianca's life insurance proceeds; and (2) the interest, dividends, and appreciation amounts of these assets. We explain each of these determinations below.

### a. Forfeiture of Subject Assets Under § 981(a)(1)(C)

The district court did not err in ordering forfeiture of Mr. Rudolph's assets under § 981(a)(1)(C). Of importance here, § 981(a)(1)(C) defines the property subject to forfeiture as "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" mail fraud. The court did not err in finding that the government satisfied the requirements of § 981(a)(1)(C) by a preponderance of the evidence. *See Garbacz*, 33 F.4th at 472. The government explained to the district court how the four subject assets—two properties (in Arizona and Pennsylvania) and two automobiles (an Aston Martin and a Bentley)—were derived

from Mr. Rudolph's transfer into his bank accounts of the roughly $4.8 million in proceeds he obtained from Bianca's life insurance policies. *See* J.A., Vol. III, at 611–41 (Gov.'s Mot. for Mandatory Restitution and Forfeiture, filed Nov. 15, 2022); J.A., Vol. V, at 1107–72, 1261–67.

Specifically, the government traced Bianca's life insurance proceeds through Mr. Rudolph's various bank accounts, established how the use of those same proceeds funded the purchase of each of the subject assets, and, to summarize its findings, produced a written report along with corresponding spreadsheets and visual aids.[34]  The district court, confirming that it understood the government's accounting, ordered forfeiture of the subject assets.

We need not reproduce the government's accounting here: suffice it to say it is both extensive and clearly reasoned.  Based on the government's accounting, the court could properly find under § 981(a)(1)(C) that the government demonstrated by a preponderance of the evidence that the subject assets were "derived from proceeds traceable to" Bianca's life insurance proceeds.  *See Garbacz*, 33 F.4th at 472 (affirming the district court's finding that two statues purchased with illegal funds

---

[34]    The government employed a modified version of the "proceeds-first" accounting approach to trace Mr. Rudolph's use of Bianca's life insurance proceeds. Under the proceeds-first approach, when criminal proceeds are commingled with untainted funds in an account and money then leaves that account, the criminal proceeds are assumed to be the first funds transferred out of the account. *See United States v. Erker*, 129 F.4th 966, 972–73 (6th Cir. 2025) (explaining the proceeds-first approach); *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159 (2d Cir. 1986) (approving the government's use of a similar accounting practice).

were forfeitable under § 981(a)(1)(C) because "[t]he district court found by a preponderance of the evidence that [Defendant] purchased the statues with proceeds of his wire fraud scheme"); *see also United States v. Omidi*, 125 F.4th 1283, 1287–88 (9th Cir. 2025) (affirming the district court's forfeiture order with respect to the proceeds from a fraudulent medical business "even though conceivably some of the incoming funds ultimately paid for legitimate and medically necessary procedures" because even proceeds derived from legitimate procedures "still were indirectly the result of the fraudulent portions of the business" (internal quotation marks omitted)).

Resisting our conclusion, Mr. Rudolph contends that the subject assets were commingled such that the untainted and tainted funds could not be divided "without difficulty," 21 U.S.C. § 853(p)(1)(E), (2), so forfeiture should have proceeded under the substitute-asset provision up to the value of the forfeitable proceeds— specifically, a judgment in the amount of the insurance proceeds, approximately $4.8 million. *See, e.g.*, J.A., Vol. V, at 1082 ("[I]t is [defendant's] position . . . as to forfeiture, that, at most, the Court can issue a forfeiture order for, again, the amount of the insurance proceeds, which was the 4.8 million."); *id.* at 1270 ("[T]he Court must resort to a money judgment which the Government can then try to seek substitute property, . . . . limited to the amount of that insurance proceeds."); *see also* Oral Arg. at 15:31 (responding "yes" when asked whether the substitute-asset provision should be applied in the event of remand for the precise amount of the insurance policy proceeds). Mr. Rudolph chiefly relies on *United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996), wherein the Third Circuit held that the government had to

64

satisfy its forfeiture judgment through § 853(p) because the commingled assets at issue could not be divided "without difficulty." *Voigt*, 89 F.3d at 1088.

However, *Voigt* is an out-of-circuit decision and thus not controlling. Moreover, the Third Circuit cabined the holding of *Voigt* in *United States v. Stewart*, 185 F.3d 112, 129–30 (3d Cir. 1999), explaining that in instances where the government "clearly traced laundered funds," forfeiture is still appropriate under the applicable statute and not under § 853(p). The government meaningfully traced the ill-gotten insurance proceeds in the present case through its proceeds-first approach; accordingly, even if the Third Circuit's forfeiture principles applied here (they do not), this case would fall within the limiting language of *Stewart*.

More fundamentally, whether the district court erred in concluding that the commingled assets could be divided "without difficulty" is a *factual* question involving scrutiny of the government's accounting of Bianca's life insurance proceeds, *see Garbacz*, 33 F.4th at 472, which we review for clear error, *see, e.g.*, *Bader*, 678 F.3d at 893. Thus, absent a showing of clear error, we accept the district court's factual findings, which credited the government's accounting. *See* J.A., Vol. V, at 1271 ("I disagree with defense counsel in terms of the relative complexity of the tracing aspect of forfeiture in this case. I thought that the [government's accounting] was not only credible, it was very logical."). And Mr. Rudolph makes no meaningful effort to demonstrate that the court clearly erred. On appeal, Mr. Rudolph does not grapple with the government's accounting; he simply alludes vaguely to his "numerous intervening deposits and withdrawals." *See* Aplt.'s

Opening Br. at 64–65.  That is not enough to secure reversal under the deferential

clear-error standard.  Accordingly, because the court did not clearly err in

determining that the commingled assets *could* be divided "without difficulty," it

likewise was correct in *not* applying § 853(p).

Accordingly, the district court properly ordered forfeiture of the subject assets

under § 981(a)(1)(C).

### b.  Forfeiture of Interest, Dividends, and Appreciation of Subject Assets

The district court also did not err in ordering the forfeiture of interest,[35]

dividends, and appreciation accrued by the subject assets under § 981(a)(1)(C).

---

[35]    Regarding interest, the district court waived interest on the restitution
and fine amounts that it imposed on Mr. Rudolph, having found that he "does not
have the ability to pay interest."  J.A., Vol. IV, at 906 (Crim. J., filed Aug. 25, 2023).
One clause in the court's oral sentence could conceivably be read to suggest that, for
similar reasons, the court also waived interest on the forfeiture amount.  *See id.*, Vol.
V, at 1273 ("[R]equiring the defendant to pay interest on its forfeiture obligation
would impair his ability to pay all of his financial obligations under the Court's
judgment and as a consequence, interest on this forfeiture amount will be waived.").
Yet we conclude that the court's oral sentence with respect to interest on Mr.
Rudolph's forfeiture amount is ambiguous.  In reaching this conclusion, we recognize
that "[t]he sentence in a federal criminal case is the punishment imposed orally by a
sentencing judge in a defendant's presence."  *United States v. Villano*, 816 F.2d
1448, 1453 (10th Cir. 1987) (en banc).  And in determining whether an oral sentence
is ambiguous, we "focus[] *exclusively on the moment when the district court formally
imposed the sentence* and [do] not comb the remainder of the sentencing transcript in
search of ambiguity."  *United States v. Barwig*, 568 F.3d 852, 856 (10th Cir. 2009)
(emphasis added).  However, in the same breath in which the court ostensibly waived
interest on the forfeiture amount, it granted "that portion of the Government's motion
for order of restitution and forfeiture . . . which seeks a final order of forfeiture."
J.A., Vol. V, at 1273.  And that motion explicitly sought the forfeiture of "earned
interest[]" on "tainted funds in the [bank] account[s]" associated with Mr. Rudolph.
*Id.*, Vol. III, at 611; *see also id.* at 593 ("In this case, the interest and dividends
earned on the tainted funds would also be forfeited, as well as any appreciation of the
real property.").  This internal contradiction in the court's oral sentence concerning

Section 981 defines "proceeds" as "*the amount of money acquired* through the illegal transactions resulting in the forfeiture."  18 U.S.C. § 981(a)(2)(B) (emphasis added). Nothing in this definition suggests that § 981(a)(1)(C) cannot include interest accrued on forfeitable assets, dividends derived from such assets, or appreciation on the value of those assets.  *See United States v. Afriyie*, 929 F.3d 63, 72–73 (2d Cir. 2019) ("We hold that as a matter of law, forfeiture [under § 981] may extend to the appreciation of funds acquired through illegal transactions in an insider-trading scheme.").  To the

---

interest on the forfeiture amount—at "the moment" that the court imposed sentence, *Barwig*, 568 F.3d at 856—rendered the court's oral sentence ambiguous.  "Ambiguity includes, but is not limited to" circumstances where "the extent of the sentence cannot be ascertained from the language used." *United States v. Geddes*, 71 F.4th 1206, 1214 (10th Cir. 2023) (quoting *Villano*, 816 F.2d at 1453 n.6).  Here, the internal contradiction in the court's language regarding whether it waived interest on the forfeiture amount prevents us from accurately discerning the scope of the court's forfeiture sentence.  Therefore, we conclude that the court's oral sentence with respect to interest on Mr. Rudolph's forfeiture amount is ambiguous.

"If there is an ambiguity in the sentence, then such extrinsic evidence as the judgment and commitment order, the judge's intentions, or the defendant's understanding of what he believes the sentence to be, may be consulted." *Villano*, 816 F.2d at 1453 (footnotes omitted).  Here, nothing in the criminal judgment indicates that the court in fact waived interest on the forfeiture amount. *See* J.A., Vol. IV, at 908 (ordering that "[t]he defendant shall forfeit the defendant's interest in the following property to the United States," including the bank accounts associated with Mr. Rudolph, without mention of an exclusion of accrued interest).  Moreover, we may reasonably infer that, at the time of sentencing, Mr. Rudolph did not understand the court's forfeiture sentence to waive interest given that he challenges the propriety of including interest on the forfeiture amount on appeal. *See, e.g.*, Aplt.'s Opening Br. at 64 (arguing that the court "improperly ordered the forfeiture . . . [of] the interest" on the funds in his bank accounts).  Accordingly, having turned to extrinsic evidence in light of the ambiguity in the court's oral sentence regarding the waiver of interest on the forfeiture amount, we conclude that the court did *not* waive such interest.  And thus we turn to examine that forfeiture-interest issue on the merits.

contrary, the forfeiture provisions in § 981 are broad in scope and seek to disgorge *all* ill-gotten gains from an offender. *See* 18 U.S.C. § 981(a)(2)(B); *see also United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012) ("[T]he calculation of a forfeiture amount in criminal cases is usually based on the defendant's actual gain."); *cf. United States v. Cline*, --- F.4th ---, 2025 WL 2414232, at *10 (10th Cir. 2025) (agreeing with other circuits that under § 981(a)(1)(C) "the proceeds traceable to each wire-fraud violation necessarily include[] *all* the proceeds the defendant obtained through the alleged scheme").

Here, Mr. Rudolph's actual gain from fraudulently procuring Bianca's life insurance proceeds extended to not just the assets he purchased but also to the appreciation, interest, and dividends stemming from those assets. The government proved this by a preponderance of the evidence: specifically, as it did with the subject assets, the government demonstrated through its accounting that each of these added values was "derived from proceeds traceable to" Mr. Rudolph's fraudulent acquisition of Bianca's life insurance proceeds. § 981(a)(1)(C); *see, e.g.*, J.A., Vol. III, at 611 ("The United States has apportioned the earned interest[], dividends, and appreciation based on the percentage of untainted and tainted funds in the account.").

Pursuant to § 981, the district court properly ordered forfeiture of interest, dividends, and appreciation stemming from the tainted insurance proceeds.

\* \* \* \*

In sum, the district court did not err in its forfeiture rulings.

68

## III.    CONCLUSION

For the above reasons, we **AFFIRM** the district court's judgment of conviction and forfeiture order.